[No. F050816. Fifth Dist. July 21, 2008.]

BRENTON R. SMITH, Plaintiff and Respondent, v.
SELMA COMMUNITY HOSPITAL, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part VIII of the Discussion.

1480

## Counsel

McCormick, Barstow, Sheppard, Wayte & Carruth, Lawrence T. Wayte and Jerry D. Casheros for Defendant and Appellant.

Andrews & Hensleigh, Barbara J. Hensleigh and John J. Aumer for Plaintiff and Respondent.

## Opinion

**DAWSON, J.**—Selma Community Hospital's (SCH) medical executive committee recommended the termination of the medical staff membership and hospital privileges of Brenton R. Smith, M.D., based solely on the termination of his privileges at two Hanford hospitals. Smith invoked the next stage of the peer review process by requesting a formal hearing. The judicial review committee sat as a trier of fact at that hearing. It found that the SCH medical executive committee had not shown by a preponderance of the evidence that its recommendation was "reasonable and warranted" as required by SCH bylaws and Business and Professions Code section 809.3, subdivision (b)(3).[1] SCH appealed the decision to its governing board. The governing board reversed, concluding that, among other things, the judicial review committee was obligated to accept as true the findings of the Hanford hospitals.

Smith challenged the governing board's decision by filing a petition for writ of mandate. The superior court granted Smith's petition, reversed the governing board, and directed SCH to reinstate the judicial review committee's decision in favor of Smith.

Based on our independent review of the governing board's decision, we conclude that it erroneously decided a number of questions of law prior to reversing the judicial review committee's decision. First, the governing board misinterpreted that decision in a number of respects. For example, it wrongly concluded that the judicial review committee did not make the findings of fact required by the bylaws. Second, it erred in concluding that the judicial review committee considered irrelevant and inappropriate evidence. Third, it erred in concluding that the judicial review committee was obligated to accept as true the findings of the Hanford hospitals. Fourth, it misapplied the substantial evidence rule.

---

[1] All further statutory references are to the Business and Professions Code unless indicated otherwise.

As a result of these errors, the final decision of the governing board must be overturned and the decision of the judicial review committee reinstated. The superior court reached the same conclusion and its judgment will be affirmed.

We emphasize that this decision does not stand for the proposition that an acute care hospital may never rely solely on the results of peer review proceedings at another hospital when reaching a decision to terminate a physician's privileges and staff membership. In that regard, we only uphold the judicial review committee's finding that, in the circumstances of this case, the results of peer review proceedings at the other hospitals were not enough.

## BACKGROUND

General background information on the peer review process as it exists in California (including the organization of hospitals and their medical staffs) and the terms of the bylaws of SCH's medical staff will provide context for understanding the facts of this case.

### Organization of Hospitals and Medical Staff

Every acute care hospital must have "an organized medical staff responsible to the governing body for the adequacy and quality of the medical care rendered to patients in the hospital." (Cal. Code Regs., tit. 22, § 70703, subd. (a).) As a result, hospitals and medical staffs are separate legal entities. (*Medical Staff of Doctors Medical Center in Modesto v. Kamil* (2005) 132 Cal.App.4th 679, 685 [33 Cal.Rptr.3d 853].) Generally, medical staffs are organized as unincorporated associations. (*Ibid.*)

A medical staff is required to adopt written bylaws. (Cal. Code Regs., tit. 22, § 70703, subd. (b).) The bylaws must establish formal procedures for evaluating "staff applications and credentials, appointments, reappointments, assignment of clinical privileges, appeals mechanisms and such other subjects or conditions which the medical staff and governing body deem appropriate." (*Ibid.*) The medical staff also must provide a means for enforcing its bylaws. (*Ibid.*) In other words, the bylaws must establish a peer review process. That peer review process is subject to minimum procedural standards set by California statute.

### Legislation Affecting Peer Review

#### Federal Legislation

In 1986, the United States Congress responded to concerns that the quality of medical care had become a nationwide problem by enacting the Health

Care Quality Improvement Act of 1986 (HCQIA). (42 U.S.C. §§ 11101–11152.) Congress found that "[t]his nationwide problem can be remedied through effective professional peer review." (*Id.*, § 11101(3).)

The HCQIA addressed peer review by setting forth minimum procedural protections for those involved in the peer review process. For example, a professional review action may not be taken until, among other things, a reasonable effort has been made to obtain the facts of the matter and adequate notice and hearing procedures are afforded the physician involved. (42 U.S.C. § 11112(a), (b).) Also, in certain circumstances, participants in a professional review are immune from liability for damages. (*Id.*, § 11111(a).)

The HCQIA also requires health care entities to report professional review activities that adversely affect a physician's clinical privileges to the National Practitioner Data Bank (NPDB). (42 U.S.C. §§ 11131–11137; see 45 C.F.R. §§ 60.1–60.14 (2008) [National Practitioner Data Bank for Adverse Information on Physicians and Other Health Care Practitioners].) Besides reporting, hospitals have a duty to obtain information from the NPDB when a physician applies for clinical privileges and once every two years for physicians who have clinical privileges. (42 U.S.C. § 11135(a).)

Because hospitals monitor the NPDB, an institution's negative decision about a physician can have a snowball effect. (Merkel, *Physicians Policing Physicians: The Development of Medical Staff Peer Review Law at California Hospitals* (2004) 38 U.S.F. L.Rev. 301, 304.) "If one hospital has identified quality concerns [regarding a physician], it is very likely that this will lead to investigations at other hospitals." (*Ibid.*)

*California's Peer Review Legislation*

The HCQIA "permitted the states to opt out of the federal law so long as their plans included certain basic procedural requirements. The California Legislature exercised this option by enacting a series of laws that set forth the procedures hospitals must, at a minimum, follow in certain peer review proceedings. These provisions, codified in sections 809 through 809.9 . . . , became effective on January 1, 1990."[2] (Merkel, *Physicians Policing Physicians: The Development of Medical Staff Peer Review Law at California Hospitals, supra*, 38 U.S.F. L.Rev. at p. 318, fns. omitted.)

---

[2] The California Legislature specifically declared its intention not to opt out of participating in any national data bank established under the HCQIA. (§ 809, subd. (a)(9)(B).)

Other reporting requirements apply to licensed health care facilities in California. Under section 805, they must file a report with the appropriate state agency when a peer review body takes certain adverse action against a licentiate. Such a report commonly is called an "805 report." (E.g., § 805, subd. (b).)

By setting minimum procedural standards, the legislation provides hospitals and medical staffs some flexibility in deciding how they will conduct a peer review proceeding. This flexibility is recognized in a legislative finding: "Sections 809 to 809.8, inclusive, shall not affect the respective responsibilities of the organized medical staff or the governing body of an acute care hospital with respect to peer review in the acute care hospital setting. It is the intent of the Legislature that written provisions implementing Sections 809 to 809.8, inclusive, in the acute care hospital setting shall be included in medical staff bylaws that shall be adopted by a vote of the members of the organized medical staff and shall be subject to governing body approval, which approval shall not be withheld unreasonably." (§ 809, subd. (a)(8).)

Consequently, the rules applicable to the peer review conducted in this case have two sources: the legislation contained in sections 809 to 809.9 and the bylaws adopted by the medical staff of SCH.

*SCH's Medical Staff Bylaws*

The medical staff of SCH adopted its current bylaws on June 6, 2002.[3] SCH's governing board approved the Bylaws on July 23, 2002. The Bylaws are 77 pages long and contain a preamble, definitions, and 15 articles. The Bylaws are supplemented with medical staff rules and regulations, which are 29 pages long.

The preamble states the Bylaws were adopted to provide for the organization and self-government of the medical staff of SCH. In addition, the "bylaws provide the professional and legal structure for medical staff operations, organized medical staff relations with the Governing Board, and relations with applicants to and members of the medical staff."

The topics addressed by the Bylaws include membership on the medical staff (article II), appointment and reappointment to the medical staff (article IV), clinical privileges (article V), corrective action (article VII), and hearings and appellate reviews (article VIII).

1. *Peer review at SCH*

The last sentence of section 5.1 of the Bylaws contains a general reference to the peer review process used at SCH: "Medical staff privileges may be . . . modified or terminated by the governing body of this hospital only upon recommendation of the medical staff, only for reasons directly related to

---

[3] Further references to "Bylaws" are to the Selma Community Hospital Medical Staff Bylaws/Rules & Regulations. (Approved June 6, 2002.)

quality of patient care and other provisions of the medical staff bylaws, and only following the procedures outlined in these bylaws."

The peer review process outlined in the Bylaws has three principal stages. The first stage, corrective action, involves an investigation by the peer review body or its designee followed by the peer review body's recommendation regarding corrective action. The second stage is a formal hearing before a body sitting as the trier of fact. The third stage is an appeal of the trier of fact's decision; the appellate body renders the final decision. The stages are described in detail after the definitions.

## 2. *Relevant definitions*

The following definitions from the Bylaws are relevant to SCH's peer review process.

"Medical staff" is defined as "those physicians, dentists, podiatrists, and clinical psychologists who have been granted recognition as members of the medical staff pursuant to the terms of these bylaws." The term "member" includes any physician holding a current license who is a member of the medical staff. "Clinical privileges" or "privileges" are defined as "the permission granted to medical staff members to provide patient care and includes unrestricted access to those hospital resources (including equipment, facilities, and hospital personnel) which are necessary to effectively exercise those privileges."

"Medical executive committee" (also MEC) is defined as the "medical executive committee of the medical staff which shall constitute the governing body of the medical staff as described in these bylaws." In this case, the medical executive committee is the peer review body that investigates complaints made against a physician on the medical staff and makes a recommendation regarding corrective action. "Investigation" is defined as "a process specifically instigated by the medical executive committee to determine the validity, if any, to a concern or complaint raised against a member of the medical staff, and does not include activity of the medical staff aid committee."

The formal hearings in the peer review process are conducted by a "judicial review committee" (also JRC or SJRC), which sits as the trier of fact. (Bylaws, § 8.3.5.)

"Governing board" means the governing body of SCH. When an appeal is taken from a decision of the judicial review committee, the governing board, or a committee of that board, sits as the appeal board. (Bylaws, § 8.5.4.)

### 3. *Investigation and recommendation for corrective action*

Section 7.1.1 of the Bylaws, which addresses the criteria for initiation of corrective action, provides in full: "Any person may provide information to the medical staff about the conduct, performance, or competence of its members. When reliable information indicates a member may have exhibited acts, demeanor, or conduct, reasonably likely to be (1) detrimental to patient safety or to the delivery of quality patient care within the hospital; (2) unethical; (3) contrary to the medical staff bylaws and rules or regulations; or (4) below applicable professional standards, a request for an investigation or action against such member may be initiated by the chief of staff, or the Medical Executive Committee."

The request for initiation must be in writing and, if the medical executive committee initiates an investigation, it must make a record of its reasons. (Bylaws, § 7.1.2.) In certain circumstances the governing board may direct the medical executive committee to initiate an investigation or disciplinary action. (*Id.*, § 7.1.6.)

The medical executive committee may conduct an investigation itself or it may assign the investigation to a medical staff officer or a committee of medical staff. (Bylaws, § 7.1.3.) A member under investigation is entitled to certain procedural protections even though the investigation does not constitute a "hearing": "The member shall be notified that an investigation is being conducted and shall be given an opportunity to provide information in a manner and upon such terms as the investigating body deems appropriate. The individual or body investigating the matter may, but is not obligated to, conduct interviews with persons involved . . . ." (Bylaws, § 7.1.3.)

The medical executive committee is required to take action as soon as practicable after the investigation is concluded. (Bylaws, § 7.1.4.) Its action may include making recommendations, such as recommending the reduction or revocation of clinical privileges and recommending the suspension or revocation of medical staff membership. (*Id.*, § 7.1.4(e), (g).)

If the medical executive committee recommends corrective action, the recommendation must be transmitted to the governing board and the member. (Bylaws, § 7.1.5(a).) The recommendation becomes the final action if the member does not request a hearing. (*Id.*, § 7.1.5(b).)

### 4. *Administrative hearing*

Grounds for a hearing exist when the recommended action includes "revocation of medical staff membership" or "termination of all clinical

privileges." (Bylaws, § 8.2(f), (j).) The member must make a written request for a hearing within 30 days of receiving the notice, or the right to a hearing shall be deemed waived. (*Id.*, § 8.3.1.)

The hearing is conducted before a judicial review committee and presided over by a hearing officer. (Bylaws, §§ 8.3.5, 8.4.3.) The judicial review committee shall be composed of at least three persons, including one with the same healing arts licensure as the accused. (*Id.*, § 8.3.5.) The medical executive committee recommends a judicial review committee and a hearing officer to the governing board. (*Id.*, §§ 8.3.5, 8.4.3.) The member is entitled to challenge the impartiality of the judicial review committee and the hearing officer. (*Id.,* § 8.4.1(e).)

The Bylaws include detailed requirements regarding how the hearing should be conducted. For example, section 8.4.7 of the Bylaws addresses the burden of presenting evidence and the burden of proof. For each case or issue, the medical executive committee has "the initial duty to present evidence . . . in support of its action or recommendation." (Bylaws, § 8.4.7(a).) Also, when the recommendation concerns a member instead of an applicant, the medical executive committee "shall bear the burden of persuading the judicial review committee, by a preponderance of the evidence, that its action or recommendation is reasonable and warranted." (*Id.,* § 8.4.7(c).)[4]

After the hearing, the judicial review committee shall deliver its decision and a written report to the medical executive committee, the governing board, hospital president, and the member. (Bylaws, § 8.4.10.) "The report shall contain a concise statement of the reasons in support of the decision including findings of fact and a conclusion articulating the connection between the evidence produced at the hearing and the conclusion reached." (*Ibid.*) Section 8.4.9 of the Bylaws requires that the decision "be based on the evidence introduced at the hearing, including all logical and reasonable inferences from the evidence and the testimony." Sections 8.4.9 and 8.4.10 of the Bylaws both include the following sentence: "The decision of the judicial review committee shall be subject to such rights of appeal as described in

---

[4] Section 8.4.7 of the Bylaws is based on section 809.3, subdivision (b), which provides: "(1) The peer review body shall have the initial duty to present evidence which supports the charge or recommended action. [¶] (2) Initial applicants shall bear the burden of persuading the trier of fact by a preponderance of the evidence of their qualifications by producing information which allows for adequate evaluation and resolution of reasonable doubts concerning their current qualifications for staff privileges . . . . [¶] (3) Except as provided above for initial applicants, the peer review body shall bear the burden of persuading the trier of fact by a preponderance of the evidence that the action or recommendation is *reasonable and warranted.*" (Italics added.)

these bylaws, but shall otherwise be affirmed by the Governing Board as the final action if it is supported by substantial evidence, following a fair procedure."[5]

### 5. *Appeal of judicial review committee's decision*

A written request for review of the judicial review committee's decision must be made within 10 days after receipt of the decision. (Bylaws, § 8.5.1.) The written request for an appeal must identify the grounds for appeal and clearly and concisely state the facts that support the appeal. (*Id.,* § 8.5.2.) "The grounds for appeal from the hearing shall be: (a) substantial non-compliance with the procedures required by these bylaws or applicable law which has created demonstrable prejudice; (b) the decision was not supported by substantial evidence based upon the hearing record . . . ." (*Ibid.*)

The appellate review of a judicial review committee's decision is conducted by an appeal board. (Bylaws, §§ 8.5.3, 8.5.4.) The governing board may sit as the appeal board, or it may appoint an appeal board consisting of at least three members of the governing board. (*Id.,* § 8.5.4.)

The procedures for the appeal are contained in Bylaws section 8.5.5, which provides: "The proceeding by the appeal board shall be in the nature of an appellate hearing based upon the record of the hearing before the judicial review committee, [subject to a proviso not applicable in this case]."

Each party has the right to be represented by an attorney, to present its position in writing, and to personally appear and present oral argument. (Bylaws, § 8.5.5.) After deliberating, the appeal board shall present the governing board with its written recommendations regarding affirmance, reversal, modification, or remand of the decision of the judicial review committee. (*Ibid.*)

If the judicial review committee's decision is supported by substantial evidence, following a fair procedure, the governing board shall render a final decision affirming the judicial review committee's decision. (Bylaws, § 8.5.6(a).) "Should the Governing Board determine that the judicial review committee decision is not supported by substantial evidence, the board may

---

[5] Similar language appeared in the bylaws in *Hongsathavij v. Queen of Angels etc. Medical Center* (1998) 62 Cal.App.4th 1123, 1135 [73 Cal.Rptr.2d 695] (*Hongsathavij*): "As indicated by the bylaws of the medical staff of the Medical Center, the decision of the JRC is not the final administrative decision. Rather, the bylaws provide that the decision of the JRC 'shall be subject to such rights of appeal or review as described in these Bylaws, but shall otherwise be affirmed by the Board of Directors as the final action if it is supported by substantial evidence, following a fair procedure.' "

modify or reverse the decision of the judicial review committee and may instead, or shall, where a fair procedure has not be[en] afforded, remand the matter to the judicial review committee for reconsideration, stating the purpose for the referral." (*Id.,* § 8.5.6(b).) The decision of the governing board "shall be in writing, shall specify the reasons for the action taken, [and] shall include the text of the report which shall be made to the [NPDB], if any . . . ." (*Id.,* § 8.5.6(c).)

## FACTS

Smith is board certified in family practice and as an emergency room physician. He obtained a license to practice medicine in California in 1981 and moved to Fresno County in 1983.

Smith and his brother started their practice by purchasing the family practice of a retired physician in Riverdale, a community of about 2,500 people. Another brother joined them, followed by a fourth brother who is a family nurse practitioner. They expanded their practice by opening clinics in other towns. Through his corporation, Smith owns 12 clinics, which are located in Riverdale, Selma, Lemoore, Corcoran, Armona, Avenal, Coalinga, Caruthers, Kerman, and Hanford (three sites). Smith estimates that he has delivered approximately 10,000 babies in over 20 years of practice in the Central Valley.

Smith and about half of his family speak Spanish. Many of Smith's clinics are in communities with large Hispanic populations.

Smith was accepted into the medical staff of Hanford Community Medical Center in 1983.[6] A few years later, Smith was accepted into the medical staff of the predecessor of Central Valley General Hospital in Hanford. After he had joined the medical staffs of those two Hanford hospitals, Smith became a member of the medical staff of SCH, which at the time was Selma District Hospital.

SCH is an acute care hospital. It was acquired in approximately 2000 by Adventist Health System, a system of hospitals that is not a party to this proceeding. Adventist Health System also owns two hospitals located in

---

[6] Although the transcript of Smith's testimony before SCH's judicial review committee indicates the year was 1993, other documents in the record show the year was 1983. For instance, the November 2003 decision of the Hanford hospital's judicial review committee stated that Smith had been a member of the medical staff of both Hanford hospitals since 1985.

Hanford—Hanford Community Medical Center and Central Valley General Hospital (Hanford hospitals).[7]

Smith's clinics compete with Adventist Health System in providing physician clinical services in that Adventist Health System, through its hospitals, owns clinics in the same areas. When Adventist Health System acquired Central Valley General Hospital in June 1998, it became the sole provider of hospital services in a 20-mile radius of Hanford and possibly all of Kings County. The only practicable place for Smith to deliver the babies of his patients is at hospitals owned by Adventist Health System.

*Proposed Sale of Smith's Practice and Related Litigation*

In March 2002, Smith and Central Valley General Hospital entered into a letter of intent that set forth terms under which Central Valley General Hospital could purchase Smith's practice. During the due diligence period, Central Valley General Hospital became concerned with what it perceived as billing irregularities. This concern and others were not resolved in negotiations between the parties, and the sale transaction was not completed.

In July 2002, Central Valley General Hospital filed a lawsuit against Smith that sought, among other things, the return of $250,000 delivered to Smith when the letter of intent was executed.[8] Smith subsequently filed a cross-complaint against Central Valley General Hospital, alleging unfair business practices and seeking an injunction to ensure the return and confidentiality of patient records.

The lawsuit over the failed purchase of Smith's practice was tried before a retired judge, sitting as a referee. In late 2004, the referee issued a statement of decision in which he found that Central Valley General Hospital had not proven its causes of action for breach of contract, fraud, negligent misrepresentation, unjust enrichment or injunctive relief. The referee also found that Smith had not proven his claims against Central Valley General Hospital, but stated an injunction should be issued directing Central Valley General Hospital and its affiliates to return confidential materials to Smith.

In its recent opinion, this court remanded the lawsuit to the superior court for further proceedings. (*Central Valley General Hospital v. Smith, supra,* 162 Cal.App.4th 501.) Those further proceedings might, or might not, change the outcome of that lawsuit.

---

[7] Adventist Health System acquired Central Valley General Hospital in June 1998. After this acquisition, the medical staffs of the Hanford hospitals, as well as their bylaws, were consolidated.

[8] The lawsuit was *Central Valley General Hospital v. Smith* (Super. Ct. Fresno County, 2006, No. 02CECG02396). That lawsuit has reached this court. (*Central Valley General Hospital v. Smith* (2008) 162 Cal.App.4th 501 [75 Cal.Rptr.3d 771] [case No. F050590].)

*Peer Review at the Hanford Hospitals*

In late March 2002, a subcommittee of the medical executive committee of the Hanford hospitals convened and was charged with investigating a series of complaints against Smith. The complaints included allegations of unprofessional conduct, disruptive behavior, abuse of staff, falsification of medical records, and substandard patient care.

On July 2, 2002, Smith was informed orally that his privileges at the Hanford hospitals had been suspended and he had been granted temporary privileges until July 9, 2002.

On July 8, 2002, Smith filed in Kings County a verified complaint for preliminary and permanent injunctive relief that requested the Hanford hospitals be enjoined from terminating or suspending his privileges unless they first afforded him fair procedure rights in accordance with section 809 et seq.

On July 9, 2002, the parties stipulated in open court that, in lieu of obtaining a ruling from the superior court on the merits of the temporary restraining order requested by Smith, the superior court would enter the following order: "The [Hanford] hospital[s] will do nothing to revoke, suspend or modify Dr. Smith's staff privileges prior to September 30, 2002, unless such modification, revocation or suspension is in full compliance with . . . Section 809, et seq."

After the entry of the stipulation and order, the medical executive committee of the consolidated medical staffs of the Hanford hospitals decided to continue the investigation of Smith and appointed an ad hoc committee for this purpose. A letter dated August 19, 2002, advised Smith that the ad hoc committee had identified a number of concerns, that he could submit a written response and appear for a personal interview, and that he should submit a written plan of correction to address the problems and deficiencies noted in an enclosure.

Smith sought a temporary restraining order to prevent the Hanford hospitals from limiting or restricting his privileges based on the grounds identified in the August 19, 2002, letter. On September 10, 2002, the superior court filed an order denying Smith's application for temporary restraining order. The superior court stated it would not enjoin the peer review process and that there were other remedies for the concerns raised by Smith about the process. Despite its denial of Smith's application, the superior court characterized as "troubling" Central Valley General Hospital's "using the possibility of loss of hospital privileges as a bargaining chip in its efforts to secure favorable terms for the purchase of the licentiate's practice . . . ."

Also on September 10, 2002, the medical executive committee of the Hanford hospitals voted to summarily suspend Smith's privileges. The incidents relied upon for the summary suspension occurred in August 2002 and involved six patient charts.

In October 2002, the medical executive committee of the Hanford hospitals reviewed the report of the investigation of Smith and voted to continue his summary suspension and to deny his reappointment.

Smith requested a formal hearing before a judicial review committee, and the hearing took place over 10 sessions beginning on April 30, 2003, and ending September 28, 2003.

The judicial review committee of the Hanford hospitals issued a 23-page decision and report in November 2003. The charges concerned substandard patient care, abusive behavior towards patients and staff, and falsification of records. The concerns identified occurred during the timeframe of January 1, 2000, to August 19, 2002.

Of the 34 instances of alleged substandard care, 23 were listed as "proven," eight were listed as "proven in part," two were listed as "not proven" and one was listed as "proven, but of minimal importance." Seven out of 26 charges of abusive behavior were listed as not proven. With respect to falsification of records, five charges were listed as proven, two were listed as not proven, two were listed as proven with extenuating circumstances, and one was listed as proven but not serious.

Based on its evaluation of the charges, the judicial review committee of the Hanford hospitals found that the summary suspension of Smith and the recommendation that he not be reappointed were reasonable and warranted.

In December 2003, Smith appealed the decision of the judicial review committee to the appeal board of the Hanford hospitals. Smith's ground for appeal was substantial noncompliance with the procedures required by statute and by the bylaws of the medical staff of the Hanford hospitals. Among other things, Smith asserted that an unbiased panel had not presided over the hearing and that he had not been given an opportunity to present all relevant evidence of the matters charged.

The governing board of Central Valley General Hospital affirmed the decision of the consolidated judicial review committee of the Hanford hospitals. The governing board's decision, which was effective January 28, 2004, became the final peer review decision of the Hanford hospitals.

Smith subsequently filed a petition for writ of mandamus challenging the final peer review decision of the Hanford hospitals.

*Proceedings at SCH*

In September 2002, when Smith learned of his summary suspension at the Hanford hospitals, he notified SCH. On September 12, 2002, Stanley Louie, D.O., the chief of staff of SCH, wrote to both Smith and the chief of staff at the Hanford hospitals to request written information explaining the reasons for the suspension.

Smith responded to SCH in a letter dated September 16, 2002. He included the written opinions of two doctors (Drs. Bruno Garcia and David Feldman) who had reviewed the six patient charts. Neither doctor found evidence of practice that placed patients in imminent danger. The letter of Dr. Garcia stated: "After reviewing all six cases there is nothing in my opinion that would warrant a summary suspension." Smith's letter also set forth his opinion: "During this time period, the Central Valley General Hospital has been trying to purchase my practice. It is my belief that the action taken by the hospitals with respect to my privileges has to do with my refusal to sell my practice under the conditions set forth by the hospital and not with the quality of medical care I provide."

Dr. Louie testified that he had worked with the two doctors who gave opinions supporting Smith, that he respected their opinions, and that he believed they had integrity. Based on the information provided and Smith's practice at SCH, Dr. Louie did not believe that Smith posed an imminent danger to patients at SCH. Furthermore, Dr. Louie did not feel the need to do an investigation or take other action at that point.

SCH did not receive a response to its request for information from the Hanford hospitals and did not conduct its own investigation into the six matters that served as the basis for Smith's summary suspension from the Hanford hospitals. As a result, SCH did not take any action to limit Smith's privileges at SCH, and Smith moved all of his hospital cases to SCH, delivering about 40 babies a month.

While the peer review proceedings were pending at the Hanford hospitals, Smith's two-year appointment to the medical staff at SCH was scheduled to expire. Consequently, in May 2003, Smith applied for reappointment.

Dr. Louie testified that, in accordance with its Bylaws, SCH conducted a review in connection with its evaluation of Smith's application. The June 12, 2003, minutes of SCH's medical executive committee stated that Smith "has

had a large volume of activity over the past two years at this facility and this activity has been monitored through established processes/peer review." SCH's medical executive committee noted that it had not received information from affiliated facilities (i.e., the Hanford hospitals) and recommended that the credentials committee evaluate Smith's application without that information and base its recommendation for reappointment on the activity and outcomes experienced at SCH.

The minutes of the credentials committee at SCH indicated that it recommended approval of Smith's application for reappointment based only on activities at SCH and left open a review of his privileges upon receipt of additional information.

SCH notified Smith by letter dated July 22, 2003, that the governing board of SCH "has ratified the approval of your re-appointment to the Active Medical Staff for the next two year period, ending June 25, 2005."

In November 2003, SCH requested and received from Smith a copy of the decision of the judicial review committee of the Hanford hospitals.

In December 2003, Smith notified SCH that he was going to take a 90-day leave of absence from the medical staff of SCH, starting January 1, 2004. Smith took the leave of absence to help with the lawsuit brought by Central Valley General Hospital concerning the failed purchase of Smith's practice.[9]

Smith requested reinstatement to SCH's medical staff with his prior privileges in a letter dated February 27, 2004. SCH requested and received from Smith a copy of the governing board's final decision in the Hanford peer review proceeding. Smith also provided SCH with a copy of a letter from his attorney stating that her office was participating in drafting a petition for writ of mandamus to overturn the decision of the governing board in the Hanford peer review proceeding and that she anticipated filing the petition within the next month.

On March 15, 2004, Smith met with Darrick Wells, M.D., who had replaced Dr. Louie as chief of staff at SCH. Dr. Wells told Smith that his privileges would be summarily suspended if he did not resign his membership or request an additional leave of nine months.

On April 8, 2004, SCH's medical executive committee held a meeting and voted to summarily suspend Smith's privileges.

---

[9] The 18-day trial in that lawsuit began in October 2003 and ended in February 2004. (*Central Valley General Hospital v. Smith, supra,* 162 Cal.App.4th at p. 510.)

Smith responded to the suspension by filing a lawsuit against SCH. On April 29, 2004, Smith obtained a temporary restraining order enjoining SCH from taking any action to suspend, restrict or otherwise impede Smith's staff membership or privileges at SCH.

On May 5, 2004, SCH's medical executive committee met with the president of SCH (who also is president of the Hanford hospitals), a representative of SCH's governing board, and SCH's director of administration. SCH's medical executive committee approved making an offer, contingent upon Smith dismissing his lawsuit against SCH in its entirety, to (1) rescind Smith's summary suspension; (2) rescind the recommendation to terminate his medical staff membership and clinical privileges; (3) not use the findings in the Hanford proceedings as the basis for (a) future corrective action or (b) denial of reappointment to SCH; (4) base future corrective action against Smith on events occurring after May 5, 2004; and (5) submit corrected reports to the California Medical Board and the NPDB. Smith did not accept the offer.

On June 4, 2004, SCH's medical executive committee voted to rescind the summary suspension, which was the basis for the temporary restraining order, and continue with the recommendation to terminate Smith's medical staff membership and clinical privileges. The written notice of charges that SCH's medical executive committee provided to Smith stated that "the MEC determined that your conduct, as finally determined after extensive hearings at the Hanford hospitals, was reasonably likely to be (1) detrimental to patient safety and to the delivering of quality patient care within the hospital, (2) unethical, (3) contrary to the Medical Staff Bylaws and rules and regulations, and (4) below applicable professional standards."

The written notice also advised Smith of SCH's selection of individuals to serve as SCH's judicial review committee. Smith objected to the four individuals on the ground they had significant economic ties to SCH. The hearing officer, retired Judge Frederic A. Jacobus, subsequently sustained the objections and struck the entire panel.

SCH, with the assistance of the Fresno-Madera Medical Society, appointed a new judicial review committee in January 2005. The members were (1) Larry Nix, M.D., (2) Mary Hill, M.D., and (3) David Hadden, M.D. Dr. Nix is an obstetrician-gynecologist, a past president of the Fresno-Madera Medical Society, and a past chief of staff at Saint Agnes Medical Center. Dr. Hill is a family practitioner. Dr. Hadden is a pathologist, had been the Coroner of Fresno County, and, at the time of appointment, was serving as the president of the Fresno-Madera Medical Society. These physicians were not members of SCH's medical staff.

The hearing before the judicial review committee took place in February and March 2005. SCH called two witnesses—Dr. Louie, the former chief of staff, and Dr. Wells, the current chief of staff. Smith called Drs. Feldman, Winkelman and Rötenberg, and himself. Dr. Rötenberg testified as an expert in peer review matters.

Smith attempted to present evidence about the events that resulted in the findings of the Hanford hospitals as well as Dr. Feldman's opinion regarding whether it was reasonable for the medical executive committee to rely on the decision of the Hanford hospitals. The hearing officer precluded this evidence on the ground that the panel was not going to retry the Hanford matter. Despite this limitation, Smith testified that some of the incidents addressed by the findings of the Hanford hospitals had been addressed in a department level peer review process and, in all such cases, no further action had been recommended.

Dr. Wells testified at the hearing that over the last year or 11 months he had been reviewing every one of Smith's charts and admissions to SCH. He stated: "There has been no fallout of medical care of those charts to this point." Dr. Wells also testified that he relied on the final decision of the Hanford hospitals, that he would not dispute the findings, and that he was not concerned about the fairness of that proceeding.

On March 31, 2005, the judicial review committee issued a six-page written decision. The decision discussed the relationship between SCH and the Hanford hospitals, the close relationship between the two Hanford hospitals that terminated Smith's privileges, the failure of the proposed transaction between Smith and one of the Hanford hospitals for the sale of his practice and 12 clinics, the charges and results of the peer review proceedings at the Hanford hospitals, and SCH's medical executive staff's offer to compromise SCH's peer review proceeding against Smith.

The judicial review committee observed that Smith was reappointed to SCH's medical staff in June 2003 and that the retrospective peer review of his work at SCH "apparently **did not** identify his clinical practices as an 'outlier.' " (Original boldface.) The judicial review committee noted that the interval examined by SCH before reappointing Smith was the interval when the events occurred that were the basis for the findings of the Hanford hospitals. Furthermore, the testimony presented to the judicial review committee did not identify any outlying outcomes from Smith's practice at SCH.

The judicial review committee's decision summarized part of Dr. Rötenberg's testimony as follows: "Dr. Jack Rötenberg provided useful information about accepted practices for Medical Executive Committees for granting and

withdrawing privileges. Information from one hospital may trigger an evaluation but should not be used solely for discipline with out [sic] being independently verified at the hospital in question (SCH). His testimony that the recommended practice for privileging should be based on events within a given hospital rather than events elsewhere (even nearby) stands in stark contrast to the actions of [SCH's M]EC. He further related degrees of action/response directed at preserving/salvaging the valuable resource a physician's training represents to any community. The actions of Selma's MEC are inconsistent with this premise. In contrast they appear unconsidered and potentially financially motivated."

The judicial review committee's decision included the following finding on the question of ultimate fact presented to it, along with an explanation of that finding: "We do not believe SCH Medial [sic] Staff through its MEC and attorney has produced evidence to convince us that the action of Selma Adventist Hospital MEC is reasonable or warranted. We believe that SCH must do their own investigation of Dr. Smith, and follow accepted guidelines such as those outlined in the model Medical Staff By-Laws as presented by . . . Jack Rötenberg, MD, and California Medical Association. The information from the Hanford hospitals may be used *as a part* of a reason to monitor Dr. Smith by accepted peer review mechanisms such as case monitoring, proctoring at surgery and a more intensive review of patients admitted to SCH. After doing their own investigation of Dr. Smith's performance at SCH, then the experiences at the Hanford hospitals may be used as additional evidence of his need to be dismissed." (Original boldface and italics.)

Later in the written decision, the judicial review committee reiterated its finding on the question of ultimate fact: "In our view, the SCH MEC did not '. . . **persuade this JRC, by a** *preponderance of the evidence,* that its action or recommendation (summary suspension/removal from the SCH staff) is/was reasonable and warranted.' " (Original boldface and italics.)

Consequently, the judicial review committee rejected the action proposed by SCH's medical executive committee.

In April 2005, SCH's medical executive committee appealed the decision of the judicial review committee to the governing board of SCH. The governing board exercised its authority under the Bylaws to appoint a committee composed of three members of the governing board to sit as the appeal board.

The appeal committee of the governing board issued a seven-page written recommendation, which recommendation considered both grounds asserted in

the medical executive committee's appeal: (1) the judicial review committee's noncompliance with the procedures required by the Bylaws was prejudicial and (2) the judicial review committee's decision was not supported by substantial evidence.

These are the two grounds for appeal identified by section 8.5.2 of the Bylaws. In addition, the Bylaws required the governing board to affirm the decision of the judicial review committee "as the final action if it is supported by substantial evidence, following a fair procedure." (Bylaws, §§ 8.4.9, 8.4.10.) Because of this requirement, the appeal board's recommendation analyzed the issue of compliance with the procedures in the Bylaws under the heading "Fair Procedure."

The appeal board's analysis of the procedures followed by the judicial review committee ended in the statement that it "questioned whether the JRC substantially complied with the procedures required by the Medical Staff Bylaws, and whether the failure to comply created demonstrable prejudice to the Selma MEC." On the question of substantial evidence, the recommendation was more direct: "[T]he Appellate Committee finds that the JRC Decision is not supported by substantial evidence."

As a result, the appeal board ultimately recommended "that the Governing Board of [SCH] reverse the JRC and affirm the MEC's recommendation to terminate Dr. Smith's Medical Staff membership and clinical privileges was reasonable and warranted."

SCH's governing board agreed with the recommendation and adopted a resolution, effective July 7, 2005, implementing the medical executive committee's recommendation to terminate the membership and privileges of Smith. The resolution stated in part:

"After receiving, discussing and considering the Appeal Committee Recommendation, it is hereby;

"Resolved, that by unanimous ballot the Governing Board of [SCH] reverses the Decision of the JRC and affirms the MEC recommendation to terminate Dr. Smith's Medical Staff membership and clinical privileges as being reasonable and warranted . . . ."

The governing board also resolved to provide the following information to the NPDB and California's Medical Board: " 'After a hearing and appeal, the Governing Board terminated Dr. Smith's Medical Staff membership and clinical privileges based on substantial evidence of numerous deficiencies in his clinical practice, professional judgment and conduct that violated the

standard of care at this hospital. This action was based on conclusive findings and conclusions resulting from another hospital's peer review process that were not refuted by this physician.' " (Italics omitted.)

The Bylaws provide that the governing board's decision "shall specify the reasons for the action taken." (Bylaws, § 8.5.6(c).) Both parties have treated the governing board's resolution and the appeal board's written recommendation as the documents that reflect the governing board's reasoning. We will do the same.

## PROCEEDINGS

On July 25, 2005, Smith filed a verified petition for writ of administrative mandamus against SCH. The petition alleged that SCH (1) acted in excess of its jurisdiction and (2) abused its discretion by (a) failing to remand the matter to the judicial review committee, (b) determining that the judicial review committee did not provide fair procedures, and (c) substituting its own judgment for that of the judicial review committee.

In June 2006, the superior court filed a judgment granting a peremptory writ of mandamus. The writ directed SCH to set aside the decision of the appeal board of July 7, 2005, and reinstate the decision of the judicial review committee of March 31, 2005. SCH filed a timely notice of appeal.

## DISCUSSION

I. *Standard for Reviewing the Governing Board's Decision*

"A hospital's decisions resulting from peer review proceedings are subject to judicial review by administrative mandate. (. . . § 809.8.)"[10] (*Kibler v. Northern Inyo County Local Hospital Dist.* (2006) 39 Cal.4th 192, 200 [46 Cal.Rptr.3d 41, 138 P.3d 193].) SCH's final decision in Smith's peer review proceeding was made by the governing board. (Bylaws, §§ 8.1.4, 8.5.6 [decision of governing board is the final decision].) Consequently, only the decision of the governing board is subject to our review. (See Code Civ. Proc., § 1094.5, subd. (a) [referring to "final administrative order or decision"]; *Hongsathavij, supra*, 62 Cal.App.4th at p. 1136 [decision of hospital's governing body was subject to judicial review].)

We independently review the governing board's decision, not the reasoning or actions of the superior court. (*Hongsathavij, supra*, 62 Cal.App.4th at

---

[10] Section 809.8 states that "[n]othing in Sections 809 to 809.7, inclusive, shall affect the availability of judicial review under Section 1094.5 of the Code of Civil Procedure . . . ."

p. 1137.) When we finish our review, we will compare our result with the superior court's judgment and see if that judgment should be affirmed or reversed.

The governing board did not sit as the trier of fact in this case. Instead, it sat as an appellate body, reviewing the decision of the judicial review committee. (Bylaws, § 8.5.5.) Consequently, our review concerns whether the governing board properly conducted its appellate review of the judicial review committee's decision.

In *Hongsathavij*, the Second Appellate District stated its review began with the threshold issue "whether the governing body applied the correct standard in conducting its review." (*Hongsathavij, supra*, 62 Cal.App.4th at p. 1136.) For purposes of this appeal, we slightly expand the phrasing of the issue. Specifically, our review concerns whether the governing board chose the correct legal standards and properly applied those standards to the decision of the judicial review committee. In other mandamus cases, this inquiry is described as an appellate court reviewing the administrative record for legal error. (E.g., *Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 427 [53 Cal.Rptr.3d 821, 150 P.3d 709].)[11]

II. *Issues Subject to Review*

Our inquiry into legal error concerns the three broad issues decided by the governing board. First, it interpreted and thus decided the meaning of the decision of the judicial review committee. Second, the governing board relied on that interpretation to decide that the judicial review committee did not follow fair procedures. Third, the governing board found that the judicial review committee's decision was not supported by substantial evidence.

We review the governing board's decisions on each of these three issues by determining the rule of law that applies to the governing board's determination and evaluating whether that rule of law was applied correctly.

III. *Interpreting the Decision of the Judicial Review Committee*

The parties dispute whether the governing board properly interpreted the decision of the judicial review committee. But the parties' appellate briefing did not discuss how this court should analyze the question whether the governing board correctly interpreted the decision of the judicial review

---

[11] Because we determine legal errors did occur and require reversal, we do not examine *Hongsathavij*'s identification of a second issue there—"whether there was substantial evidence to support the governing body's decision." (*Hongsathavij, supra*, 62 Cal.App.4th at p. 1136.)

committee. Consequently, we sent the parties a letter before oral argument asking that they be prepared to address this issue. In particular, we asked whether the governing board was resolving a question of fact or a question of law when it decided the meaning of the judicial review committee's decision.

At oral argument, counsel for SCH contended that the interpretation of the judicial review committee's decision was a question of law and that the administrative record constituted extrinsic evidence that aids in that interpretation.

Smith's counsel argued that, consistent with the substantial evidence rule, the decision of the judicial review committee should be presumed to be correct and every reasonable inference should be drawn to support that decision. Smith supports this argument by noting that the Bylaws repeatedly state that the judicial review committee's *decision*, not its findings, shall be affirmed if supported by substantial evidence. (Bylaws, §§ 8.4.9, 8.4.10, 8.5.6(a).)

The issue of how a reviewing court should analyze the governing board's interpretation of the judicial review committee's decision is not addressed in the Bylaws or by California's statute that contains the minimum procedural requirements for the peer review process. We have located no case concerning peer review proceedings that expressly addresses whether the interpretation of a decision of a judicial review committee presents a governing board with a question of law or a question of fact.

█ In a peer review proceeding, the judicial review committee sits as the trier of fact. As a result, its role is similar to that of a superior court in an ordinary civil proceeding. The general rules for interpreting writings apply to the interpretation of a trial court's judgment. (*Southern Pacific Pipe Lines, Inc. v. State Bd. of Equalization* (1993) 14 Cal.App.4th 42, 49 [17 Cal.Rptr.2d 345].) We conclude, therefore, that the same rules apply to the interpretation of the judicial review committee's decision.

### A. *Existence of Ambiguity Is a Question of Law*

Generally, the first issue that arises in interpreting a writing is whether the writing is ambiguous—that is, whether it is reasonably susceptible to more than one interpretation.

Under the general rules for interpreting writings, whether an instrument is ambiguous is a question of law. (E.g., *United Services Automobile Assn. v. Baggett* (1989) 209 Cal.App.3d 1387, 1391 [258 Cal.Rptr. 52] [insurance policy].) As a question of law, it is subject to our independent review. (See

*Winet v. Price* (1992) 4 Cal.App.4th 1159, 1165 [6 Cal.Rptr.2d 554] ["the threshold determination of ambiguity is subject to independent review"].)

Therefore, we conclude that the question whether the decision of the judicial review committee is ambiguous is a question of law subject to our independent review.

### B. *Resolving an Ambiguity Is a Question of Law*

Except where extrinsic evidence used to aid interpretation is conflicting, the resolution of an ambiguity in a writing is a question of law. (*Societe Civile Succession Richard Guino v. Redstar Corp.* (2007) 153 Cal.App.4th 697, 701 [63 Cal.Rptr.3d 224] ["interpretation of any writing is a question of law even if extrinsic evidence has been introduced, as long as the extrinsic evidence is not conflicting"]; *Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839] [it is "solely a judicial function to interpret a written instrument unless the interpretation turns upon the credibility of extrinsic evidence"].)

In this case, the extrinsic evidence is the administrative record, which establishes the context in which the judicial review committee rendered its decision. (Cf. *Hirshfield v. Schwartz* (2001) 91 Cal.App.4th 749, 766 [110 Cal.Rptr.2d 861] [when trial court's judgment is ambiguous, appellate court examines entire record, including pleadings].) The administrative record does not contain evidence directly concerning the meaning of the decision of the judicial review committee. It may be possible to draw conflicting inferences from the administrative record, but the existence of conflicting inferences does not require this court to defer to the interpretation of the governing board. (See *Parsons v. Bristol Development Co., supra*, 62 Cal.2d at p. 866, fn. 2 [possibility of conflicting inferences indicates appellate court's duty to interpret the written instrument].)

Therefore, we conclude that the governing board resolved a question of law each time it interpreted the decision, and we must resolve the same questions of interpretation by conducting an independent review.

In summary, when reviewing the governing board's interpretation on a particular point, we must decide the legal questions whether the decision of the judicial review committee was ambiguous on that point and, if so, whether the governing board adopted a correct interpretation when resolving that ambiguity. We will address these legal questions in the context of the two other broad issues that the governing board decided. Specifically, we will decide whether the governing board correctly determined the meaning of the judicial review committee's decision when the governing board concluded that (1) fair procedures were not followed and (2) substantial evidence did not support the decision.

## IV. *Fair Procedure*

As described earlier, the governing board's decision phrased the issue of fair procedure in terms of whether the judicial review committee substantially complied with the procedures required by the Bylaws and whether any noncompliance was prejudicial. The governing board's decision stated that "[i]t appears the JRC failed to follow the Bylaws by not making any factual findings, and by basing its decision on inappropriate information."

### A. *Collateral Estoppel*[12]

The most significant controversy between the parties concerns the legal effect of the findings of the Hanford hospitals. Neither the Bylaws nor California statute addresses the role that the disciplinary findings of one hospital play in the peer review process of another hospital.

#### 1. *Contentions of the parties*

The governing board stated: "There is no question that the Findings and Conclusions in the Hanford Decision have the full force and effect of a final administrative decision. Therefore, the JRC was obligated to accept as true the findings of the Hanford JRC, and to determine only whether it believed those findings reasonably supported the Selma MEC's recommendation of termination. They failed to make that determination."

Similarly, SCH's opening brief contends that the judicial review committee erred by failing to apply the doctrine of issue preclusion: "For its part, the SJRC was obligated to consider the Hanford factual findings as conclusively proven. [¶] Though this was set forth before the SJRC, the Committee disregarded that position . . . . [¶] This required reversal by the Selma Governing Board."

Smith argues that collateral estoppel applies to neither the facts of this case nor the peer review process in general.[13] Rather, according to Smith, " 'A[n administrative] decision will not be given collateral estoppel effect if [an]

---

[12] The terms "collateral estoppel" and "issue preclusion" are used in this opinion to mean the same thing. (See Heiser, *California's Confusing Collateral Estoppel (Issue Preclusion) Doctrine* (1998) 35 San Diego L.Rev. 509, fn. 1 [terms are interchangeable].) Therefore, we note our disagreement with the heading in appellant's reply brief that asserts: "The Lower Court Should Have Applied the Doctrine of Issue Preclusion, a Component of Collateral Estoppel." (Full capitalization omitted.) Specifically, we do not view California's issue preclusion doctrine as a "component" of California's collateral estoppel doctrine.

[13] This two-pronged approach is consistent with the way the California Supreme Court analyzes collateral estoppel. (*Pacific Lumber Co. v. State Water Resources Control Bd.* (2006) 37 Cal.4th 921, 943–944 [38 Cal.Rptr.3d 220, 126 P.3d 1040] [five threshold requirements are

appeal [to superior court] has been taken or if the time for such appeal has not lapsed.' [(*Long Beach Unified Sch. Dist. v. State of California* (1990) 225 Cal.App.3d 155, 169 [275 Cal.Rptr. 449].)]"

In response, SCH asserts that, while "the Hanford *decision* was not final, so long as it still could be overturned via Writ of Mandate[,] . . . this is not the issue before the Court. Rather, [SCH's] position on the issue preclusion doctrine is simple. [Smith] failed to challenge the substance of the administrative findings against him at Hanford, even though he had an opportunity to do so. [Citation.] Rather, he only challenged the Hanford findings on procedural grounds. [Smith's] failure to challenge the substantive findings of the Hanford hospitals' decision constituted a waiver of that claim under the doctrine of issue preclusion." (Fns. omitted.)

### 2. *Interpretation of the judicial review committee's decision*

The first step in our analysis of the collateral estoppel question concerns whether the governing board interpreted the judicial review committee's decision accurately.

The judicial review committee unambiguously concluded that Smith's privileges at SCH could not be terminated based solely on the findings of the Hanford hospitals. The parties and this court agree on this interpretation.

Disagreement exists, however, regarding the exact rationale for the judicial review committee's conclusion that the Hanford findings, standing alone, did not provide a sufficient reason to terminate Smith's privileges at SCH. The judicial review committee's decision did not specify the exact rationale.

Neither can the exact rationale be discerned solely from the inferences that are possible from the facts and evidence set forth in the decision. In other words, the inferences are conflicting in that they do not all point to one interpretation.

On the one hand, one could infer that the judicial review committee included facts demonstrating the conflicts of interest between the Hanford hospitals and Smith to show that it had some level of doubt about the reliability of the findings of the Hanford hospitals and did not accept those findings as conclusively proven. On the other hand, one could infer that the judicial review committee accepted the Hanford findings as true based on its statement that "[t]here was no support presented at this JRC for the theory that Dr. Smith's behavior at one hospital would be replicated at SCH."

---

considered first and, if they are met, public policies are reviewed to determine if collateral estoppel should be applied in the particular setting].)

The governing board appeared (1) to interpret the judicial review committee's decision to mean that the judicial review committee did not accept the Hanford findings as true, and (2) to consider this failure a violation of the judicial review committee's obligation to treat the Hanford findings as conclusively proven.

For purposes of our analysis of the collateral estoppel, waiver, and exhaustion arguments presented by SCH, we need not reach a definitive interpretation regarding how the judicial review committee treated the findings of the Hanford hospitals. We will assume for purposes of argument that SCH's assertion that the judicial review committee did not treat the Hanford findings as *conclusively* proven is the correct interpretation.[14]

### 3. *Collateral estoppel did not apply during SCH's peer review*

■ The doctrine of collateral estoppel applies only if the following elements have been established: "First, the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding. Second, this issue must have been actually litigated in the former proceeding. Third, it must have been necessarily decided in the former proceeding. Fourth, the decision in the former proceeding must be final and on the merits. Finally, the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding. [Citations.]" (*Lucido v. Superior Court* (1990) 51 Cal.3d 335, 341 [272 Cal.Rptr. 767, 795 P.2d 1223].)

Even where these five threshold requirements have been met, the doctrine may not be applicable in a particular setting because of the public policies underlying the doctrine. (*Pacific Lumber Co. v. State Water Resources Control Bd., supra,* 37 Cal.4th at pp. 943–944.)

SCH contends that, in this case, the fourth element—a final decision on the merits—is not necessary. This is because, so the reasoning goes, Smith's failure to challenge the substantive findings of the Hanford hospitals' decision constituted a waiver of the claim that those findings were wrong. In addition, SCH seems to be arguing that Smith did not fully exhaust the administrative and legal remedies available to challenge the Hanford findings and, therefore, could not challenge those findings in SCH's peer review proceeding.

First, to the extent that SCH is attempting to argue that all five elements of the collateral estoppel doctrine do not apply because it is only relying on the

---

[14] At oral argument, counsel for SCH contended that the judicial review committee's decision unambiguously treated the findings of the Hanford hospitals as unsubstantiated allegations and gave those findings no weight. We reject this contention.

issue preclusion "component" of the collateral estoppel doctrine, we reject that argument. (See fn. 12, *ante.*)

■ Second, with respect to finality, we conclude that the following principles set forth by the court in *Long Beach Unified Sch. Dist. v. State of California, supra,* 225 Cal.App.3d 155 apply: "Finality for the purposes of administrative collateral estoppel may be understood as a two-step process: (1) the decision must be final with respect to action by the administrative agency [citation]; and (2) the decision must have conclusive effect [citation]. [¶] . . . [¶] [To have conclusive effect], the decision must be free from direct attack. [Citation.] A direct attack on an administrative decision may be made by appeal to the superior court for review by petition for administrative mandamus. [Citation.] A decision will not be given collateral estoppel effect if such appeal has been taken or if the time for such appeal has not lapsed. [Citations.]" (*Id.* at pp. 168–169.)

In this case, the decision of the Hanford hospitals lacked the requisite finality because Smith had appealed that decision to the superior court. Therefore, the elements of collateral estoppel were not met during SCH's peer review proceedings against Smith, and that doctrine did not constitute a legally valid basis for giving the decision of the Hanford hospitals conclusive effect.

Based on the foregoing, we reject SCH's argument that, under the doctrine of issue preclusion, the factual findings of the Hanford hospitals could not be challenged substantively in the SCH proceeding because Smith did not challenge those substantive findings on the ground of insufficient evidence.

### 4. *Waiver and exhaustion of remedies*

SCH also has cast its argument regarding the conclusive effect of the findings of the Hanford hospitals in terms of both waiver and exhaustion of remedies.

■ SCH's waiver argument is unconvincing. Under California law, a waiver is the intentional relinquishment or abandonment of a known right or privilege. (*In re Sheena K.* (2007) 40 Cal.4th 875, 881, fn. 1 [55 Cal.Rptr.3d 716, 153 P.3d 282].) Waiver is a question of fact (*Bickel v. City of Piedmont* (1997) 16 Cal.4th 1040, 1052 [68 Cal.Rptr.2d 758, 946 P.2d 427]) and always is based upon intent (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 31 [44 Cal.Rptr.2d 370, 900 P.2d 619]). We cannot infer (either as a matter of law or as a matter of fact) that Smith intended to relinquish the right to rely on the principles regarding administrative collateral estoppel when he chose not to challenge the findings of the Hanford hospitals on the ground of the

sufficiency of the evidence. Such an inference of intent makes little sense because if Smith had succeeded in reversing the decision of the Hanford hospitals on the ground that their judicial review committee was biased or economically interested in the outcome, then the findings of fact contained in that decision would have been vacated and would no longer be binding. Furthermore, SCH has cited no authority holding that such an inference of intent is appropriate as a matter of law. The governing board sat as an appellate body, not as the trier of fact, and therefore it lacked the authority to make an independent finding of fact regarding Smith's intent to relinquish a particular right.[15]

SCH also contends that it is settled law that the factual and legal conclusions of an agency are binding in later litigation if they are not properly overturned by way of mandamus. SCH supports this contention by citing cases that involve the exhaustion of judicial or administrative remedies doctrine. (See *Westlake Community Hosp. v. Superior Court* (1976) 17 Cal.3d 465, 484–485 [131 Cal.Rptr. 90, 551 P.2d 410] (*Westlake*); *Fair Political Practices Com. v. Californians Against Corruption* (2003) 109 Cal.App.4th 269, 282–283 [134 Cal.Rptr.2d 659] [exhaustion of judicial remedies doctrine]; *Tahoe Vista Concerned Citizens v. County of Placer* (2000) 81 Cal.App.4th 577, 592 [96 Cal.Rptr.2d 880] ["a failure to raise an issue in an administrative appeal after raising the issue in the first public or administrative hearing constitutes a failure to exhaust administrative remedies and prevents the issue from being raised in a subsequent judicial action"]; *Butte View Farms v. Agricultural Labor Relations Bd.* (1979) 95 Cal.App.3d 961, 971 [157 Cal.Rptr. 476] [failure to raise issue during administrative proceedings prevented party from raising the issue in a court proceeding challenging the administrative decision].)

In *Westlake*, a doctor filed a tort action against a hospital and various individuals sitting on the hospital's boards and committees after the hospital revoked the doctor's staff privileges. (*Westlake, supra*, 17 Cal.3d at p. 485.) The doctor did not challenge the revocation of his privileges in a mandamus proceeding, but instead immediately filed the tort action seeking damages. (*Ibid.*) The court concluded that "a doctor who has been denied hospital staff privileges must exhaust all available internal remedies before instituting any judicial action, including an action seeking only damages . . . ." (*Id.* at p. 485.)

The court further concluded that an aggrieved doctor must first succeed in setting aside the hospital's quasi-judicial decision in a mandamus action

---

[15] We recognize that the Bylaws authorize the governing board to make findings of fact in certain circumstances. (Bylaws, §§ 8.5.5, 8.5.6(b).) Those circumstances do not exist in this case.

before the doctor may institute a tort action for damages. (*Westlake, supra,* 17 Cal.3d at p. 469.) For purposes of applying this rule, the court stated that the grounds upon which the hospital's decision was set aside did not matter—it could be set aside because of a substantive or procedural defect. (*Id.* at p. 484.)

The facts of *Westlake* are distinguishable from Smith's situation because (1) the lawsuit in Westlake was between a doctor and the hospital that conducted the peer review proceeding and (2) the results of that peer review proceeding were not being challenged in a pending mandamus action. Thus, *Westlake* did not address the effect that findings from the peer review proceedings of one hospital should be given in subsequent peer review proceedings of another hospital. Accordingly, while the principles from *Westlake* might apply in a lawsuit Smith brought against the Hanford hospitals for damages, the case is not authority for the proposition that those principles apply to litigation between Smith and a different hospital.

In addition, we note that the reference in *Westlake* to overturning the hospital's administrative decision on either substantive or procedural grounds is incompatible with SCH's argument that Smith's pending mandamus proceeding against the Hanford hospitals was required to challenge the findings on sufficiency of the evidence grounds.

Similarly, none of the other cases cited by SCH is analogous to the present appeal. Those cases do not address the role that one administrative agency's findings plays in the administrative proceedings *of another agency*—that is, in a collateral proceeding. Instead, those cases only state principles applicable to subsequent litigation against the agency or its agents. Consequently, we reject SCH's attempt to apply principles relating to the exhaustion of remedies to this case.

In summary, SCH's governing board committed legal error when it stated: "There is no question that the Findings and Conclusions in the Hanford Decision have the full force and effect of a final administrative decision." It committed further legal error when it concluded that the judicial review committee "was obligated to accept as true the findings of the Hanford JRC . . . ."

The consequences that flow from this error are discussed in part VI., *post.*

B. *Factual Findings by the Judicial Review Committee*

The governing board's conclusion that the judicial review committee did not make any factual findings is based on an incorrect interpretation of the

judicial review committee decision. The judicial review committee's written decision explicitly stated: "We do not believe SCH Medical Staff through its MEC and attorney has produced evidence to convince us that the action of Selma Adventist Hospital MEC is reasonable or warranted."

Two paragraphs later, the judicial review committee restated its determination as follows: "In our view, the SCH MEC did not '. . . **persuade this JRC, by a *preponderance of the evidence,*** that its action or recommendation (summary suspension/removal from the SCH staff) is/was reasonable and warranted.' " (Original boldface and italics.)

These statements tracked the applicable language of the statute and Bylaws. Specifically, section 809.3, subdivision (b)(3) provides that "the peer review body shall bear the burden of persuading the trier of fact by a preponderance of the evidence that the action or recommendation is reasonable and warranted." Bylaws section 8.4.7(c) tracks this statutory language by providing that "the Medical Executive Committee shall bear the burden of persuading the judicial review committee, by a preponderance of the evidence, that its action or recommendation is reasonable and warranted."

The judicial review committee's statements clearly articulated its finding on the issue of fact identified by the statute and Bylaws. Its statement[16] is as much a finding of fact as the opposite statement would have been—that is, a statement that the judicial review committee was persuaded by a preponderance of the evidence that the recommendation was reasonable and warranted.

Furthermore, the factual nature of the underlying matter to be proven—that is, whether the medical executive committee's proposed action was reasonable and warranted—is evident from the language in the statute and bylaw provision. The use of the terms "preponderance of the evidence" and "trier of fact" in section 809.3, subdivision (b)(3) and Bylaws section 8.4.7(c) clearly indicates the question presented is one of fact.

This interpretation of the statute and Bylaws is consistent with a general principle of law recognized by California courts. Specifically, "the question of reasonableness is ordinarily one of fact." (*Elgin Capital Corp. v. County of Santa Clara* (1975) 57 Cal.App.3d 687, 692 [129 Cal.Rptr. 376] [question presented in inverse condemnation proceeding was reasonableness of public agency's delay in acquiring property]; see *Brasher's Cascade Auto Auction v. Valley Auto Sales & Leasing* (2004) 119 Cal.App.4th 1038, 1059 [15

---

[16] The judicial review committee's statement that it was not persuaded is the equivalent of the Scottish verdict "not proven." (See Note, *Not Proven: Introducing a Third Verdict* (2005) 72 U. Chi. L.Rev.1299, 1300 ["not proven" verdict indicates the jury was unable to determine factual guilt or innocence].)

Cal.Rptr.3d 70] [whether conduct was commercially reasonable under Cal. U. Com. Code was question of fact]; *Geertz v. Ausonio* (1992) 4 Cal.App.4th 1363, 1368 [6 Cal.Rptr.2d 318] [whether construction defect is apparent by reasonable inspection is question of fact].)

In summary, we conclude that (1) whether the medical executive committee persuaded the judicial review committee by a preponderance of the evidence that its proposed action was reasonable and warranted was a question of fact and (2) the judicial review committee made an explicit finding on this question. Therefore, the governing board's decision cannot be upheld on the ground that the judicial review committee failed to make findings of fact as required by the Bylaws or statute.

### C. *Relevant and Appropriate Evidence*

The governing board's decision stated that the judicial review committee did not provide a fair procedure because it considered irrelevant[17] or inappropriate evidence. More specifically, that decision stated "the JRC Decision set forth eight paragraphs of highly editorialized summaries of various facts and circumstances giving rise to the JRC hearing. None of these editorial comments were relevant or should have been used in the findings of the JRC."

SCH's position regarding relevant and appropriate evidence is based on its legally erroneous conclusion that the doctrine of issue preclusion applied and conclusively established the findings and conclusions rendered by the Hanford hospitals. SCH contends that, because the findings were conclusive, evidence concerning the reliability of those findings was not relevant or appropriate for the judicial review committee to consider.

We reject this contention regarding what evidence was irrelevant and inappropriate. The judicial review committee, in its role as trier of fact, was required to determine whether the medical executive committee had persuaded it, by a preponderance of the evidence, that the recommended termination of Smith was reasonable and warranted under the circumstances of this case. Because issue preclusion, exhaustion of remedies, and waiver did not apply, the judicial review committee considered whether it was reasonable for the medical executive committee to treat the findings of the Hanford

---

[17] Evidence Code section 210 defines relevant evidence as evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." The test of relevance is whether the evidence tends " 'logically, naturally, and by reasonable inference' to establish material facts such as identity, intent, or motive. [Citations.]" (*People v. Garceau* (1993) 6 Cal.4th 140, 177 [24 Cal.Rptr.2d 664, 862 P.2d 664], overruled on other grounds in *People v. Yeoman* (2003) 31 Cal.4th 93, 117–118 [2 Cal.Rptr.3d 186, 72 P.3d 1166].)

hospitals as conclusively established *and* as a sufficient basis for terminating Smith's privileges at SCH. As a result, the judicial review committee was required to consider (1) the reliability of those findings and (2) the weight those findings should be given as a predictor of Smith's future behavior at SCH. Therefore, evidence regarding those two points was relevant.

### 1. *Settlement negotiations*

In paragraph No. 1 on the third page of its decision, the judicial review committee discussed an attempt by the SCH medical executive committee to strike a bargain with Smith if he would dismiss his lawsuit against SCH, including the temporary restraining order. In exchange, the SCH medical executive committee proposed (1) rescinding the summary suspension of Smith, (2) rescinding the recommendation to terminate Smith's privileges, and (3) forgoing use of the findings of the Hanford hospitals as a basis for corrective action against Smith.

In paragraph No. 2 on the fourth page of its decision, the judicial review committee stated that, on one occasion, Smith was told that his resignation from SCH's medical staff would ensure that an 805 report was not filed.

The judicial review committee characterized SCH's negotiations as follows: "This is hypocrisy if the hospital wants the panel to share their concerns about patient safety. This, in and of itself makes it appear as if the SCH and the SCH MEC has more economic concerns than patient safety worries."

We conclude that the evidence regarding settlement negotiations was relevant and could be considered by the judicial review committee.

First, the negotiations are relevant because reasonable inferences can be drawn from them regarding the SCH medical executive committee's motivation for treating the Hanford findings as conclusive as well as its flexibility in regarding the findings as conclusive in nature. (*People v. Garceau, supra,* 6 Cal.4th at p. 177 [test for relevance].) For instance, the negotiations provide additional information about the conflicts of economic interest that exist between the owner of SCH and Smith. These conflicts support the inference that SCH pursued a peer review proceeding against Smith and chose to treat the Hanford findings as conclusive for reasons other than patient safety.

Second, whether it was appropriate to consider this relevant evidence is answered by a provision in the Bylaws. Section 8.4.6 of the Bylaws provides: "Judicial rules of evidence and procedure relating to the conduct of the hearing, examination of witnesses, and presentation of evidence shall not

apply to a hearing conducted under this Article. Any relevant evidence, including hearsay, shall be admitted if it is the sort of evidence on which responsible persons are accustomed to rely in the conduct of serious affairs . . . ." In accordance with this provision, the rule that evidence of an offer of compromise is inadmissible to prove the offering party's liability does not apply. (See Evid. Code, § 1152, subd. (a) [inadmissibility of offers to compromise].) Furthermore, SCH has identified no authority that states consideration of such negotiations is inappropriate.

Therefore, we conclude the judicial review committee did not commit legal error or violate the Bylaws by considering the medical executive committee's offers to compromise the litigation and peer review proceeding.

### 2. *Economic interests of SCH's owner*

SCH argues that the irrelevant evidence considered by the judicial review committee included (1) the relationship between SCH and the Hanford hospitals, (2) the financial motives of SCH or its corporate owner for terminating Smith's medical staff membership and privileges, and (3) the corporate owner's involvement in an attempt to purchase Smith's practice.

We conclude that the information regarding common ownership and the economic interests of the owner of SCH and the Hanford hospitals meets the test for relevance because reasonable inferences can be drawn from that information regarding the motivation of SCH and the Hanford hospitals. (*People v. Garceau, supra*, 6 Cal.4th at p. 177 [test for relevance].) Information about the conflicts of economic and other interests between the owner of SCH and Smith supports reasonable inferences as to (1) why SCH and the Hanford hospitals pursued peer review proceedings against Smith and (2) why SCH did not pursue other action that would have been taken by an entity primarily concerned with patient safety. As an example of action not taken, the judicial review committee specifically stated that no evidence was produced to show that, once SCH learned of the proceedings at the Hanford hospitals (September 2002), an attempt was made to monitor Smith's practice, records, or behavior at SCH.[18]

In addition, the refusal of the Hanford hospitals to provide SCH with information about its peer review proceedings against Smith, when viewed in

---

[18] This statement was made in paragraph No. 6 on the fourth page of the judicial review committee's decision.

the context of the common ownership of SCH and the Hanford hospitals, supports inferences that undermine the reliability of the findings of the Hanford hospitals.[19]

Consequently, we reject SCH's contention that "none of these considerations were relevant to the question of whether the Hanford findings constituted an appropriate basis for the SMEC's termination recommendation." In short, the conflicts between the interests of Smith and the corporate owner of the three hospitals provided the judicial review committee with a rational reason to be skeptical of the Hanford findings and to inquire further into the circumstances of the case before deciding whether it was reasonable and warranted for the medical executive committee to rely solely on those findings.

### 3. *Expert opinion and model bylaws*

The decision of the judicial review committee stated: "We do not believe SCH Medical Staff through its MEC and attorney has produced evidence to convince us that the action of Selma Adventist Hospital MEC is reasonable or warranted. We believe that SCH must do their own investigation of Dr. Smith, and follow accepted guidelines such as those outlined in the model Medical Staff By-Laws as presented by . . . Jack Rötenberg, MD, and California Medical Association. The information from the Hanford hospitals may be used *as a part* of a reason to monitor Dr. Smith by accepted peer review mechanisms such as case monitoring, proctoring at surgery and a more intensive review of patients admitted to SCH. After doing their own investigation of Dr. Smith's performance at SCH, then the experiences at the Hanford hospitals may be used as additional evidence of his need to be dismissed." (Original boldface and italics.)

SCH has interpreted this and other statements in the judicial review committee's decision to mean that the judicial review committee adopted a legal standard that prohibited the medical executive committee from revoking a physician's privileges based solely on the adverse findings of another hospital. Specifically, SCH's opening brief argues that the judicial review committee utilized a standard proposed by an expert witness and ignored the standard contained in the Bylaws. We must determine whether this interpretation is correct.

---

[19] We note that the incidents from August 2002 that involved six patient charts that the Hanford hospitals relied upon to summarily suspend Smith were discounted or disregarded by SCH's chief of staff after Smith presented other doctors' analyses of the charts to SCH. The Hanford hospitals may have been concerned about a similar result if they shared information.

### a. *Ambiguity*

Is the judicial review committee's decision ambiguous? The above quoted paragraph from that decision contains four sentences. We resolve the legal question of ambiguity by concluding that, while the first sentence is not, the last three sentences are ambiguous.

The first sentence is a clear statement of the judicial review committee's finding on the question of ultimate fact—namely, whether the medical executive committee had demonstrated, by a preponderance of the evidence, that its proposed action was reasonable and warranted. (§ 809.3, subd. (b)(3); Bylaws, § 8.4.7(c).) The last three sentences are ambiguous because, while they could be interpreted as SCH contends, they also could be interpreted as providing an explanation of the finding of ultimate fact that is narrower and based on the particular facts and circumstances of this case.[20]

### b. *Interpretation*

A proper interpretation of the last three sentences of the above quoted paragraph does not lead to the conclusion suggested by SCH—that the judicial review committee applied a broad legal standard prohibiting a medical executive committee from revoking a physician's privileges based solely on the adverse findings of another hospital. Rather, the three sentences provide a fact-based explanation of the finding of ultimate fact set forth in the first sentence. The explanation indicates that the medical executive committee's actions were not reasonable because of *omissions*. Elsewhere in the decision, the judicial review committee identified the omissions (the lack of case monitoring or an investigation of Smith's behavior at SCH) and described how other actions of SCH were not consistent with promoting patient safety at SCH. The judicial review committee attempted to show why the omissions were unreasonable by stating what should have been done *in the circumstances of Smith's case* so that its actions would have been reasonable. While this explanation has characteristics of an advisory opinion or dicta, it is an acceptable way to illustrate the scope of the omission. (See Bylaws, § 8.4.10 [report shall connect evidence presented to conclusion reached].)

The particular statement that "SCH must . . . follow accepted guidelines such as those outlined in the model Medical Staff By-Laws" cannot be read in isolation to mean that the judicial review committee regarded the referenced guidelines as an invariable standard or rule that applied in all situations. When read in context, we conclude that the judicial review committee

---

[20] This interpretation treats each of the three sentences as if they begin: "In the circumstances of this case . . . ." In other words, this interpretation treats that phrase as inherent in the sentences.

determined that an investigation and the referenced guidelines met the reasonableness standard that it was applying to the facts and circumstances presented. The use of the words "such as" indicates that the judicial review committee did not regard the provisions from the model bylaws as mandatory in this case. Also, paragraph No. 7 on the fourth page of the judicial review committee's decision uses the terms "accepted practices" and "recommended practice" to describe Dr. Rötenberg's testimony. Thus, the judicial review committee characterized Dr. Rötenberg's testimony as setting forth recommendations, not an invariable standard or rule.

Consequently, we reject the interpretation that the judicial review committee applied a standard that was not in the Bylaws. The Bylaws contain a standard—the actions of the medical executive committee must be reasonable and warranted. The judicial review committee applied this standard to the facts, as is evident from its explicit finding of ultimate facts.

In short, SCH has misinterpreted the judicial review committee's findings and rationale, which necessarily are dependent upon the specific facts of this case, as the adoption of a legal rule that would apply regardless of the facts presented.

Accordingly, we conclude that the governing board committed error when it concluded that the judicial review committee applied an incorrect legal standard.

The consequences of this error are addressed in part VI., *post.*

V. *Substantial Evidence Rule*

The governing board, which sat as an appellate body, was required to apply the substantial evidence standard to the findings of the judicial review committee. (Bylaws, §§ 8.4.9, 8.4.10, 8.5.1.) It concluded that the decision of the judicial review committee was not supported by substantial evidence. We must decide whether the governing board committed error in reaching its determination.

A. *Standard of Review*

1. *Substantiality of evidence is a question of law*

Generally, "[t]he existence or nonexistence of substantial evidence is a question of law." (*Mau v. Hollywood Commercial Buildings, Inc.* (1961) 194 Cal.App.2d 459, 466 [15 Cal.Rptr. 181].) The same principle applies when

findings of fact are made in an administrative proceeding. "Whether substantial evidence exists to support the administrative decision is a question of law." (*Angelier v. State Board of Pharmacy* (1997) 58 Cal.App.4th 592, 598, fn. 5 [68 Cal.Rptr.2d 213]; see *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 573 [38 Cal.Rptr.2d 139, 888 P.2d 1268] [substantiality of the evidence supporting administrative decisions under California Environmental Quality Act is a question of law].)

### 2. *Independent review*

"A person aggrieved by an agency determination has a right to independent judicial review of questions of law . . . ." (9 Witkin, Cal. Procedure (4th ed. 1997) Administrative Proceedings, § 111, p. 1156.) For instance, in a proceeding under the California Environmental Quality Act, the existence of substantial evidence to support a fair argument that a proposed project may have a significant effect on the environment is a question of law subject to an appellate court's independent review. (*Pala Band of Mission Indians v. County of San Diego* (1998) 68 Cal.App.4th 556, 571 [80 Cal.Rptr.2d 294].)

Therefore, we will conduct an independent review of the evidence before the judicial review committee and determine if it constituted substantial evidence in support of that committee's findings of ultimate fact. We will compare our independent conclusion on that question of law with the conclusion reached by the governing board and see if the governing board correctly applied the substantial evidence rule.

### B. *Application of Substantial Evidence Rule*

Under the substantial evidence rule, "the power of the appellate [body] begins and ends with a determination whether there is any substantial evidence, contradicted or uncontradicted, which supports the finding." (*Kimble v. Board of Education* (1987) 192 Cal.App.3d 1423, 1427 [238 Cal.Rptr. 160].) Evidence is "substantial" for purposes of this standard of review if it is "of 'ponderable legal significance,' 'reasonable in nature, credible, and of solid value' . . . . [Citations.]" (*Grappo v. Coventry Financial Corp.* (1991) 235 Cal.App.3d 496, 507 [286 Cal.Rptr. 714].)

We conclude that substantial evidence supports the findings of ultimate fact by the judicial review committee. The governing board's error in applying the substantial evidence standard occurred, in part, because it made two errors about the evidence that was before the judicial review committee. First, the governing board erroneously concluded that certain evidence was irrelevant or inappropriate. Second, it erroneously concluded that the findings of the Hanford hospitals were binding and conclusive.

### 1. *Interpretation of judicial review committee's decision*

The judicial review committee found that the medical executive committee had not shown by a preponderance of the evidence that its proposed termination of Smith's privileges and staff membership was reasonable and warranted.

We have assumed for purposes of this appeal that the judicial review committee did not regard the findings of the Hanford hospitals as conclusively established. We have interpreted the judicial review committee's decision to mean that, in the circumstances of this case, the medical executive committee had not shown that it was reasonable and warranted to terminate Smith's privileges based solely on those findings and the inference that the behavior found to have occurred at the Hanford hospitals was likely to recur at SCH. In other words, the findings of the Hanford hospitals were not so reliable that they should be taken at face value. Furthermore, assuming that some or all of those findings about Smith's behavior were true, it was not reasonable to ignore other evidence, such as Smith's record at SCH, when deciding whether that behavior would be repeated at SCH.

### 2. *Reliability of the findings of the Hanford hospitals*

The evidence shows significant conflicts between the interests of Smith and the interests of the Hanford hospitals and their owner. In particular, Smith's clinics compete with clinics owned by Adventist Health System; Smith agreed to sell and Central Valley General Hospital agreed to buy his clinics, but the transaction was not completed; Central Valley General Hospital filed a lawsuit against Smith in July 2002, arising out of the failure to complete the sale; and Smith subsequently filed a cross-complaint against Central Valley General Hospital and others.

This information supports the inference that the Hanford hospitals' findings against Smith are less reliable than they would have been had these conflicts not existed. In particular, this information provides some support for Smith's theory that the Hanford hospitals were pursuing peer review proceedings against him in an attempt to gain a stronger position in the litigation arising out of the cancelled sale transaction.[21]

A further concern about the reliability of the findings of the Hanford hospitals arises from Smith's practice at SCH. By June 2004 when SCH's

---

[21] It appears that the superior court that dealt with Smith's request for an order temporarily restraining his summary suspension by the Hanford hospitals may have agreed with this theory. In a September 10, 2002, order denying the application for temporary restraining order, the superior court characterized as "troubling" Central Valley General Hospital's "using the possibility of loss of hospital privileges as a bargaining chip in its efforts to secure favorable terms for the purchase of the licentiate's practice . . . ."

medical executive committee proposed the termination of Smith's privileges, SCH's own experience with Smith did not include any cases of substandard care. This lack of corroboration undermines the reliability of the findings of the Hanford hospitals.

In addition, the six cases from August 2002 that were the basis for Smith's summary suspension by the Hanford hospitals were refuted by Drs. Garcia and Feldman, and Dr. Louie, SCH's chief of staff, was satisfied with their explanation of those cases. The fact that SCH was not willing to rely on the findings of the Hanford hospitals with respect to the six cases from August 2002 shows that the Hanford hospitals were capable of making unreliable findings. This provides additional support for the inference that the Hanford hospitals were motivated by concerns other than patient safety and that, therefore, their findings were not reliable.

The evidence regarding the conflicts of interest and the lack of corroboration is substantial and adequately supports the finding that SCH's medical executive committee failed to show by a preponderance of the evidence that it acted reasonably when it chose to treat the Hanford findings as conclusively established. First, the choice was not justified as a matter of law because (1) the Bylaws did not require it and (2) the legal doctrines of collateral estoppel or exhaustion of remedies did not apply. Second, the choice was not justified as a matter of fact because surrounding circumstances raised enough concerns about the reliability of the findings of the Hanford hospitals that it was not reasonable to treat the findings as conclusive. (See *Webman v. Little Co. of Mary Hospital* (1995) 39 Cal.App.4th 592 [46 Cal.Rptr.2d 90] [hospital obtained two 805 reports filed against physician by another hospital, but attempted to investigate underlying incidents rather than treat reports as conclusive].)

Thus, assuming the judicial review committee made an underlying finding that the medical executive committee did not act reasonably when it treated the Hanford findings as conclusively established, that underlying finding is supported by substantial evidence.

### 3. *Inference that behavior would recur at SCH*

Paragraph No. 5 on the fourth page of the judicial review committee's decision states: "There was no support presented at this JRC for the theory that Dr. Smith's behavior at one hospital would be replicated at SCH." Thus, it appears the judicial review committee considered whether it was reasonable to infer that Smith's behavior was likely to recur at SCH.

On the one hand, the evidence supporting the inference that the behavior would recur at SCH was that (1) Smith's practice at SCH involved the same

type of physician services that he provided to patients at the Hanford hospitals and (2) the Hanford hospitals are relatively close to SCH so the community standards would be the same or similar. On the other hand, the evidence supporting the inference that the behavior would not recur at SCH includes (1) the passage of time after the cases that were the basis for the findings of the Hanford hospitals and before SCH's medical executive committee made its decision, (2) Smith's awareness of the behavior upon which the findings of the Hanford hospitals were based, and (3) the actual lack of any incidents of substandard care by Smith at SCH, either before, during[22] or after the time period that was examined by the Hanford hospitals.

We conclude that the evidence was sufficient to weaken the inference that the behavior the Hanford hospitals found occurred there was likely to recur at SCH. As a result of the weakness of that inference, the judicial review committee's finding that the medical executive committee failed to show by a preponderance of the evidence that its proposed action was reasonable and warranted also is supported by substantial evidence. In short, the judicial review committee was not persuaded by the evidence that it was reasonable for SCH's medical executive committee to rely *solely* on the finding of the Hanford hospitals as the basis for inferring that Smith's behavior was likely to recur at SCH.

In summary, the governing board misapplied the substantial evidence rule to the findings of the judicial review committee.

## VI. *Consequences of Governing Board's Legal Errors*

The governing board's decision includes several errors of law. It misinterpreted the decision of the judicial review committee, misapplied the collateral estoppel or the exhaustion of remedies doctrine, erroneously decided certain evidence was irrelevant, and misapplied the substantial evidence test.

What relief should be granted to correct these errors? The rules set forth in the Bylaws provide the answer. Sections 8.4.9 and 8.4.10 of the Bylaws state: "The decision of the judicial review committee shall be subject to such rights of appeal as described in these bylaws, but shall otherwise be affirmed by the Governing Board as the final action if it is supported by substantial evidence, following a fair procedure." This language is not ambiguous. It clearly provides that the governing board is required to affirm the decision of the

---

[22] In paragraph No. 3 on the fourth page of its decision, the judicial review committee observed that during the interval when the events that were the subject of the proceedings at the Hanford hospitals occurred, Smith did not have similar problems at SCH.

judicial review committee if two conditions are met—the decision is supported by substantial evidence and fair procedures have been used.

In this case, we have concluded that the decision of the judicial review committee was supported by substantial evidence and the procedures contained in the Bylaws were followed. Therefore, both conditions have been met and the decision of the judicial review committee should be affirmed.

The superior court accurately implemented these provisions in the Bylaws when it ordered a writ to be issued directing the reinstatement of the decision of the judicial review committee. Accordingly, the judgment will be affirmed.

## VII. *Judicial Notice*

On February 8, 2008, SCH filed a request for judicial notice of Smith's January 10, 2008, request for dismissal of his petition for writ of mandamus that challenged the Hanford hospitals' decision to terminate his clinical privileges.

Generally, when a court considers a writ for administrative mandamus, it reviews only the record of the proceeding before the administrative agency. (See *Pomona Valley Hospital Medical Center v. Superior Court* (1997) 55 Cal.App.4th 93, 101 [63 Cal.Rptr.2d 743] [general rule applied to hospital peer review proceeding].) Code of Civil Procedure section 1094.5, subdivision (e) allows the administrative record to be augmented with relevant evidence in certain situations, such as when the evidence was excluded improperly from the administrative hearing or could not be produced through the exercise of reasonable diligence.

Therefore, the threshold question we address is whether the dismissal is relevant evidence. (See *Western States Petroleum Assn. v. Superior Court, supra*, 9 Cal.4th at p. 570 [extra-record evidence is admissible in mandamus action only if relevant].) It appears that SCH contends this extra-record evidence is relevant to the existence of the fourth element of the collateral estoppel doctrine—finality of the administrative decision (see pt. IV.A.3, *ante*).

Evidence that the fourth element finally was met in January 2008 is not relevant to whether the collateral estoppel doctrine was applied correctly during the SCH peer review proceedings that ended in July 2005. Indeed, the document that is the subject of the request for judicial notice supports the conclusion that the trier of fact did not err when it failed to apply the doctrine of collateral estoppel to the findings of the Hanford hospitals.

Accordingly, the request for judicial notice is denied.

VIII. *Miscellaneous Arguments**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment of the superior court is affirmed. Smith shall recover his costs on appeal.

Wiseman, Acting P. J., and Levy, J., concurred.

Appellant's petition for review by the Supreme Court was denied October 28, 2008, S166456.

---

*See footnote, *ante*, page 1478.