Filed 4/25/23  Marriage of Whooley CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re the Marriage of JAMES and ZANA WHOOLEY. | B313832 |
| JAMES WHOOLEY, | Los Angeles County Super. Ct. No. BD602832 |
| Respondent, | |
| v. | |
| ZANA WHOOLEY, | |
| Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Bruce G. Iwasaki, Judge.  Affirmed.

CunninghamLegal and Daniel G. Van Slyke for Appellant.

James Whooley, in pro. per., for Respondent.

Zana Whooley (mother) challenges an order modifying the custody and visitation provisions of a 2016 judgment of dissolution to award her former husband James Whooley (father) sole legal custody and de facto sole physical custody of their two sons.[1]  Mother contends the family court erred by (1) declining to permit the older son to address the court regarding his preference for custody; (2) admitting into evidence a child custody evaluator's testimony and report; and (3) failing to apply the changed circumstances rule in determining a custody

---

[1]     The order purported to preserve what the judgment referred to as "joint physical custody," while reversing the arrangement so that father would have primary custody and mother would have parenting time with the boys each Tuesday and Thursday evening and on the second and fourth weekends of each month.  In determining whether the changed circumstance rule applies, we must look "at the existing de facto arrangement between the parties to decide whether physical custody is truly joint or whether one parent has sole physical custody with visitation rights accorded the other parent."  (*In re Marriage of Biallas* (1998) 65 Cal.App.4th 755, 759–760.)  Here, the physical custody arrangement under the judgment, and the modified arrangement under the order, both reflect what reviewing courts have characterized as sole physical custody with generous visitation rights for the other parent. (See, e.g., *id.* at pp. 758–760 [where father had custody "every Thursday evening until Friday morning and every other weekend from Friday evening until Monday morning," "Mother had what was effectively sole physical custody, and Father had liberal visitation rights"]; *In re Marriage of Whealon* (1997) 53 Cal.App.4th 132, 142 [same].)  Thus, notwithstanding the reference to "joint physical custody," we must review the order as a change in custody awarding father sole physical custody of the children.

modification was necessary to serve the children's best interests. We find no abuse of discretion and affirm.

## FACTS AND PROCEDURAL BACKGROUND

At mother's request we have sealed certain confidential records related to this child custody proceeding, including the custody evaluator's report that substantially informed the family court's decision. (See Cal. Rules of Court, rule 8.45; Fam. Code, § 3025.5, subd. (a); *id.*, § 3111, subd. (a).)[2] We must, however, discuss *some* facts from these records in order to provide an opinion "in writing with reasons stated" as required under our state constitution.[3] (Cal. Const., art. VI, § 14; see *Sager v. County of Yuba* (2007) 156 Cal.App.4th 1049, 1051; cf. § 3111, subd. (f) ["For purposes of this section, a disclosure is unwarranted if it is done either recklessly or maliciously, and is not in the best interest of the child."].) Consistent with our standard of review, we state the facts in the light most favorable to the family court's ruling, drawing all reasonable inferences to uphold the court's decision. (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 614; *Chalmers v. Hirschkop* (2013) 213 Cal.App.4th 289, 300.)

---

[2]     Statutory references are to the Family Code, unless otherwise designated. Rule references are to the California Rules of Court.

[3]     We also granted mother's request to file the challenged order under seal to the extent the order discussed the custody evaluator's recommendations. But, again, because mother's appeal challenges the family court's stated grounds for modifying custody—grounds that largely rested on the evaluator's observations and recommendations—we must discuss the order and the family court's reasoning to fulfill our constitutional mandate to provide a written opinion with reasons stated for our disposition of the appeal.

3

1. ***The Judgment of Dissolution***

Mother and father were married in 2004 and separated in 2014. They have two sons: J.W. (born 2006) and L.W. (born 2009). At the time of the parents' separation, L.W. had been diagnosed with autism and was receiving special education and therapeutic services.

On June 14, 2016, the family court entered a judgment of dissolution awarding the parents joint legal custody and mother de facto sole physical custody of the children. (See fn. 1, *ante*.)

In exercising joint legal custody, the judgment required both parents to consent to decisions regarding each child's enrollment in public or private school; participation in extracurricular activities; nonemergency medical, dental, and orthodontic treatment; participation in mental health counseling, therapy, or treatment; change in residence; issuance of a driver's license; and flying as an unaccompanied minor.

With respect to physical custody, the judgment granted father visitation with the children on the first, third, and fifth weekends of the month; Tuesday evenings; and Wednesday evening until Thursday morning. Mother had custody of the children all other times. The judgment granted each parent two weeks of vacation time with the children during their summer break from school; made other provisions for custody during the holidays; and prohibited the parents from removing the children from the state without the other parent's prior written consent.

2. ***Father's Request for Order Modifying the Judgment***

In the two years following entry of the judgment, significant disputes between the parents arose over the exercise of joint legal custody, particularly with respect to educational

4

and therapeutic decisions for L.W. Disagreements also emerged concerning father's contact with the children when they were in mother's care. In May 2018, father, through his legal counsel, proposed the parents stipulate to a parenting plan coordinator to resolve what he characterized as "recurrent child custody disputes." Mother rejected the proposal.

On August 24, 2018, father filed a request for order (RFO) modifying the legal and physical custody provisions of the judgment. The RFO principally sought an order for a comprehensive child custody evaluation with recommendations regarding the legal and physical custody of the children. Pending completion of the custody evaluation, father requested modification of the visitation schedule to extend his weekend visits to every weekend and he asked for sole authority to make decisions regarding the children's education and psychological health, including their participation in individual counseling.

In a supporting declaration filed with the RFO, father catalogued what he characterized as mother's "refus[al] to cooperate in the best interests of the children," including mother's efforts to overrule and invalidate father's agreement to an Individualized Education Program (IEP) for L.W.; her refusal to obtain a psychological evaluation for both children; her rejection of ongoing proposals to obtain co-parenting therapy; and her refusal to enroll L.W. in an after-school tutoring program.

Father claimed mother had also engaged in increasingly "inappropriate and abusive conduct" toward him since entry of the judgment, including limiting his access to the children and "denigrating" him in their presence. The "most egregious example," according to father, was a February 2018 phone call

mother conducted with the speaker phone on in L.W.'s presence, during which she called father " 'dirt,' 'piece of shit,' and 'child abuser' " while accusing father of "sexually targeting [his] friend's five-year-old daughter." The next evening, father realized L.W. had been present for the call after the boy "repeatedly (and with great anxiety)" asked father not to schedule any time with father's friend and her daughter, then repeated a statement father made during the previous night's call. Apart from this incident, father said mother was "offensive and disparaging" to him "on many other occasions in front of the children"; she refused to allow the boys to video chat with him during her custodial time; she concealed important events involving the children, including L.W.'s first communion; and she objected to father attending the boys' extracurricular activities, including J.W.'s sporting events, during her custody time.

Because mother refused to agree to a parenting plan coordinator, father maintained a comprehensive custody evaluation was needed to examine the increasingly counterproductive conflicts and to provide guidance on how he and mother could "appropriately co-parent" the boys.

On October 4, 2018, mother and father entered a stipulation to appoint a child custody evaluator "to make non-binding findings and recommendations to the parties and their counsel regarding physical and legal custody" of the children. The parents expressly agreed "a child custody evaluation is appropriate based on the issues raised in [father's] RFO and the major disagreements between the parties regarding appropriate services/activities to address [L.W.'s] special needs." They also stipulated to continue the hearing on father's RFO; to set a hearing on the evaluator's recommendations; and to meet

and confer, through their respective legal counsel, to reach a possible "agreement regarding applicable *Sanchez* waivers."[4] On November 27, 2018, the family court entered an order confirming the terms of the stipulation.

### 3.    *The Custody Evaluation*

On April 18, 2019, the family court entered an order on mother's and father's signed stipulation appointing Karin Manger as child custody evaluator for the purpose of making findings and recommendations to the court.  Among other things, the stipulation and order provided, "The evaluator's report shall be received in evidence without foundation or objection, subject to cross-examination and the right of the parties to challenge the findings and conclusions of the evaluator and to examine her and any out-of-court declarants at the evidentiary proceeding."

On May 27, 2019, Manger submitted her child custody evaluation report to the family court in accordance with the stipulation.  As outlined in the report, Manger met with each parent individually twice; conducted a home visit to each parent's residence; met with each parent and the children at her office; conducted a school observation of L.W.; and held a conjoint office meeting with the parents.  She also interviewed professionals who had provided educational and behavioral services to L.W. since entry of the judgment of dissolution and other individuals familiar with the family; reviewed documents provided in connection with those interviews; and attended L.W.'s most

---

[4]    A *Sanchez* waiver generally "allow[s] for admission of records containing case-specific hearsay." (*People v. Johnson* (2020) 55 Cal.App.5th 96, 99, fn. 2; see *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*).)

7

recent IEP planning meeting (in late May 2019) at his elementary school.

Manger determined "the present legal custody arrangement is not serving the children's needs." Her investigation had shown the parents were unable "to cooperate in such a manner as to make mutually agreeable decisions, that are also in the best interest of the children, in a timely and effective way." Addressing concerns father raised in his RFO, and based on her interviews with the parents, children, and other professionals who had worked with the family, Manger concluded that J.W. and L.W. would not get the services they needed, "especially those that do not directly involve [mother], if [mother] is able to have the final or sole decision-making authority" over mental health services and educational planning for the boys. Thus, the evaluator recommended a modification to the joint legal custody arrangement that would grant father final decision-making authority in these areas. In Manger's view, absent these "carve-outs to the legal custody, there is the likelihood that both parents will turn repeatedly to the court to make decisions for their children."[5]

---

[5] While Manger described mother as "a fully engaged and very loving parent," she observed mother's "identity is somewhat tied to being the parent of a special needs child," and this caused mother to "have a great deal of difficulty letting go of her influence over the children, as evidenced by her resistance to the children participating in programs and activities recommended by others." For example, Manger noted mother had been "very resistant to either child participating in an after-school program and individual therapy," just as she had resisted L.W. participating in "additional interventions for his social skills." Manger determined these were "very appropriate

8

services" that would "benefit" both boys, and she expressed "great concern that even though [these services] ha[d] been recommended by various professional[s] trained in working with children on the Autistic Spectrum, [mother] still ignore[d] their input and recommendations." The evaluator also worried that mother's "inability, or unwillingness, to consider recommendations that she does not agree with could result in the children missing out on opportunities that would ultimately benefit them."

Manger was especially troubled that, due to mother's resistance, L.W. had not been enrolled in a social skills group nearly a year after his applied behavior analysis (ABA) therapist had recommended those services. Based on her observations, Manger determined it was "crucial" that the recommended services be implemented "as soon as possible," as without intensive social skills training, she believed L.W. was unlikely to develop the skills needed to have appropriate social relationships as he approached middle school.

Manger found father was willing to accept the input and recommendations of professionals who worked with the family, but when he tried to implement those recommendations, he was consistently stymied by mother's resistance. The evaluator observed father was more "willing to be self-reflective" and this suggested he would be better able to make "well informed, child focused decisions for the children." Mother, in contrast, appeared unable to "separate her negative feeling about [father] from the needs of the children," and Manger warned this would "make any future co-parenting nearly impossible," as mother seemed likely to "continue to stonewall any suggestions made by [father]." Manger observed mother "was often unwilling to negotiate with [father] to find a mutually acceptable solution, and she was unyielding in her stance of being the parent who knows what is best for the children."

9

Manger also recommended modification of the physical custody arrangement to give father equal time with the children. While the evaluator found both parents were "dedicated" and wanted the best for their children, she observed mother had "a great deal of resentment and distrust" for father, which "seep[ed] out in various ways" and had "a negative effect" on the boys. Specifically, Manger found mother's distrust was at times "transferred onto [L.W.], who then reacts with greater fear and anxiety about change than he might otherwise experience," causing him to adopt "more resistance toward [father's] parenting style." While Manger did not believe mother "intentionally alienates" the children from father, she found mother's "psychological need to be the preferred parent" caused mother to engage in conduct that did "not promote the boys to love and trust their father to the extent that would be optimal." Contrary to mother's allegations, the evaluator saw no evidence that father was "overly harsh or impatient with the boys, or that his parenting style has a negative effect on either child." Rather, she found both boys would benefit from spending more time with father, as he tended to encourage them "to be more independent and self-sufficient than [did mother]," which afforded the boys a needed "balance" to mother's "more coddling style of parenting."

4. *The Evidentiary Hearing*

The matter was continued for more than two years following issuance of the custody evaluator's report, in part to facilitate discovery and largely due to the COVID-19 pandemic.

In advance of the evidentiary hearing on his RFO, father filed a trial brief seeking primary physical custody of the children and sole legal custody based on the custody evaluator's report and what father characterized as mother's "continued refusal

10

to implement any of the recommendations set forth therein or recommendations made by other educational professionals regarding services to be provided to the minor children."

Beginning on May 3, 2021, the family court conducted a six-day evidentiary hearing. The principal witnesses were father, mother, and the custody evaluator. The court denied mother's request to have J.W. address the court regarding his preference for custody under section 3042.

Manger and father largely reiterated the evidence and findings contained in the custody evaluation report, while father also testified to ongoing, and sometimes worsening, conflicts with mother that had persisted in the two years since the report was issued. In the past year, father said mother had refused to cooperate with him regarding vacation requests, seeing the boys on their birthdays, and J.W.'s dental care.[6] Father also described

---

[6] Father highlighted the conflict over J.W.'s dental care as especially troubling. He said mother had generally refused to cooperate with J.W.'s orthodontic treatment after father asked her to contribute financially, which had led to delays in J.W. receiving recommended procedures. In the past year, however, mother had intensified her protest that J.W.'s braces were "unnecessary" and that the orthodontist had recommended them just "for the money." The conflict culminated in mother taking J.W. to a different dentist and unilaterally demanding to have J.W.'s braces removed before his treatment was completed because, in mother's words, J.W.'s orthodontist had a " 'financial vested interest [in doing] whatever [father] tell[s] them to.' " J.W.'s braces were not removed, but the boy's orthodontic treatment was nonetheless delayed due to the parents' inability to cooperate and productively communicate regarding his dental care.

how the lack of cooperation and conflict had continued to spill over into decisions regarding the boys' medical and mental health treatment. Despite recommendations for L.W. to undergo testing for attention deficit disorder, father testified that mother refused even to permit testing, citing concerns over L.W. taking medication for the condition. He said mother refused to allow him to discuss the HPV vaccine with J.W.'s pediatrician, describing a recent incident when mother forced the pediatrician to end a joint call by shouting down father's questions and "talking about litigation." And, despite recommendations from behavioral therapists and Manger to enroll L.W. in a social skills group and to obtain individual counseling for both boys, father testified mother continued to thwart his efforts to implement those recommended services.

In advance of the 2020 school year, L.W.'s IEP team recommended that his special services should be largely discontinued. The team found L.W. had made tremendous progress between spring of 2019 and 2020, he was academically thriving, and he no longer needed—and did not want—the in-class aide who had shadowed him since kindergarten. Father agreed with the recommendation; mother opposed it. Notes from an IEP team meeting documented that mother was "repeatedly reminded to maintain a civil tone in expressing her disagreement." Father said this referred to mother "interrupting, raising her voice, sort of talking over people," and engaging in "constant fault finding of the observations and recommendations that the IEP team was making." Ultimately, the school district implemented the IEP based on father's consent, notwithstanding mother's opposition. Father nevertheless maintained mother's combative stance remained relevant to the future custody

12

arrangement because there were other education decisions to be made for both children outside the IEP context.

In March 2020, a school psychologist sent an email to counseling students and parents offering 15-minute weekly " 'check-ins' " during the " 'period of school closure[s]' " occasioned by the COVID-19 pandemic. Mother responded by demanding the psychologist's removal from L.W.'s IEP team, characterizing the offer as an attempt " 'to implement IEP modifications, and to expand [the psychologist's] role since she aggressively proposed to remove [L.W.'s] aide.' " Mother insisted the offer was a " 'harassing email,' " berated the psychologist for having " 'the arrogance to think that I need her counseling,' " and asked whether the psychologist would be father's " 'star witness' " in " 'the district's further interference in my family law matters?' " The district declined to remove the school psychologist from L.W.'s IEP team.

The evidence showed L.W. responded well to the district's recommended changes, which father supported and mother opposed. A 2021 triennial evaluation found L.W. no longer required special education services. He earned all A's and B's during the challenging pandemic year and scored average or above average on a variety of achievement tests. The district concluded L.W. had " 'made significant progress and no longer [met] eligibility for special education services.' "

Mother's testimony largely corroborated father's account of the ongoing lack of cooperation. She confirmed L.W. had not been enrolled in a social skills group, and asserted the recommendation had been made because father was threatening "a lawsuit." She also confirmed she had refused to consent to the boys participating in individual therapy, citing, among

13

other concerns, her opposition to them seeing father's "chosen therapist" and her view that neither boy needed therapy to deal with the emotional issues accompanying their unique family situation. In mother's telling, L.W.'s success in being "mainstream[ed]" was due to her being the "stubborn one" who did not accept every professional opinion the way father did. She rejected the evaluator's suggestion that her open conflicts with L.W.'s therapists had hindered his treatment and maintained that any perceived tension was due to her "exposure" of the therapists' wrongdoing. Mother admitted she opposed J.W. having braces, but said it was because she believed a 12-year-old was "too young," despite never having spoken to a medical professional who shared that view. She denied that she opposed J.W. taking the HPV vaccine, but acknowledged she had not taken him to receive it. She would not agree to a parenting plan coordinator because she believed that person would always be biased for father.

## 5.     *The Statement of Decision*

On June 30, 2021, the family court issued a statement of decision thoroughly summarizing and analyzing the evidence presented at the hearing.[7] The court ordered father would have

---

[7]     Mother requests we take judicial notice of records related to a citation issued by the Court Reporters Board of California against the court reporter who transcribed the evidentiary hearing. Mother makes the request to support a single sentence in her opening brief, asserting, "The Court further violated due process, among other ways, by entering the Order before the Court Reporter produced a transcript." We will grant the request and take judicial notice of the records (Evid. Code, § 452, subd. (c)), but mother's one-sentence argument does not establish reversible error, let alone that a violation of her due process

14

sole legal custody and de facto sole physical custody of J.W. and L.W. (See fn. 1, *ante*.) In exercising sole legal custody, the order vested father with final decision making authority regarding the children's enrollment in school; participation in particular religious activities (provided that each parent would be authorized to bring the children to religious services or ceremonies of the parent's choice during the parent's custody time); psychiatric, psychological, or other mental health counseling or therapy; selection of a doctor, dentist, or other health professionals (except in emergency situations); participation in extracurricular activities; and out-of-state travel. As for de facto sole physical custody, the order granted mother parenting time (visitation) with the children the second and fourth weekends of each month from Friday at 6:00 p.m. through Sunday at 6:00 p.m., and each Tuesday and Thursday from 3:00 p.m. until 7:00 p.m.[8] Father would have physical custody of the boys all other times.

---

rights occurred. In her closing argument to the family court, mother raised the matter in connection with an unpublished appellate opinion holding the appellant's failure to provide a reporter's transcript mandated that the reviewing court presume the unreported trial testimony would demonstrate the absence of error. Here, we have a reporter's transcript of the family court proceedings to review mother's appellate arguments, and mother has not demonstrated how she was otherwise prejudiced by the family court making its findings, *based on the court's receipt of the evidence during the hearing*, without a written transcript of the testimony, as juries regularly do.

[8]     The order provided mother would have no visitation with the children from July 4, 2021 to July 23, 2021, citing the need for a "hiatus to ameliorate [mother's] malign influence on the

The court found that "while [mother] sincerely loves the children, her suspicion and reflexive hostility toward medical and educational professionals, her efforts to sabotage the boys' relationship with their father, and her false and unsupported assertions in this hearing, convince this Court that it is in the children's best interests that [father] have authority to make decisions concerning their health, education and welfare, and exercise more of the day-to-day parenting time."

The court found mother's "testimony was often at odds with more reliable evidence." Among other examples, the court highlighted an incident when mother made a " 'gun gesture toward [L.W.]'s face' with her hands," purportedly to teach the young boy that "he would not be believed if he complained about things that were not as serious as he claimed." L.W.'s ABA therapist observed the incident and documented that it resulted in "an 'intense cry' " by L.W. In an email response to the therapist, mother expressed contrition for the incident, clarifying her intention and explaining she had " 'miss-expressed' " herself. In an interview with Manger, mother likewise admitted making the gun gesture but maintained the matter "had been taken out of context." However, in her testimony, mother denied ever making the gesture, claimed Manger had misrepresented her interview, and disavowed her written apologies, insisting "there was nothing for her to be sorry about" and that she wrote the email just to get L.W.'s therapist " 'off [her] back.' " The court

_____

boys." Because this period has passed, we cannot grant mother effective relief from this aspect of the order, and we consider the issue moot. (See *Californians for an Open Primary v. McPherson* (2006) 38 Cal.4th 735, 783.)

16

found mother's testimony reflected "not merely a failure to accept responsibility for her conduct," but also an intentional falsehood.[9]

The court found there were "significant changes in circumstances" since the June 2016 judgment was entered. While the existing joint legal custody arrangement had been premised on the understanding that the parents were capable of cooperating in making decisions about the boys' education, extracurricular activities, medical and mental health treatment, and travel, the court found the ensuing five years had proved the parents had "an abysmal co-parenting relationship." The court explained:

> "[Father] has been engaged in the children's educational process, trusts the judgment of professionals, and encourages the children's independence. [Mother] is suspicious of educators and other professionals, undermines the children's relationship with their father, fosters their dependence on her, does not support frequent and continuing contact between the boys and their father, and lack[s] candor. [Mother] has impeded initiation of needed services for [L.W.]. She has encouraged resistance and refusal behavior by the boys toward [father]. Now [L.W.] has successfully exited from special education services due

---

[9]     As we discuss later, the court found the "most troubling aspect" of mother's lack of credibility related to false assertions she made in a declaration purporting to present J.W.'s statements regarding alleged abuse by father.

in part to steps recommended by the school district. [Mother] fought those measures; [father] supported them."[10]

The court also found that, while the existing physical custody arrangement had been premised on the understanding that mother would facilitate frequent and continuing contact with father, the past five years had shown mother "sabotaged [father's] relationship with the boys." The court observed mother had refused to let father see L.W. on his birthday; she accused father of being a "pedophile" and "child abuser" on a call she knew L.W. would overhear; she "refused, with no reason, to allow the boys to be at [father's] home during remote learning sessions"; the custody evaluator found mother had " 'a psychological need to be the preferred parent,' and thus 'does not promote the boys to love and trust their father' "; mother's conduct had "caused the boys to exhibit resistance

_____

[10] Mother contends the court improperly considered matters related to L.W.'s 2018 IEP that were settled by a final judgment in an administrative action she litigated against the school district. While mother argues the court "violated the doctrine of collateral estoppel by relitigating the appropriateness of the 2018 IEP," she does not cite to any place in the record where she objected to these matters being raised. Indeed, mother emphasizes that father called a school district representative as a witness, who, in mother's telling, "accepted an opportunity to testify against the parent who successfully defended [L.W.]'s rights against the District," but mother does not point to, and we cannot find, any objection she made on res judicata grounds to this testimony or other evidence concerning the 2018 IEP. We deem the argument forfeited. (See *Amato v. Mercury Casualty Co.* (1993) 18 Cal.App.4th 1784, 1794.)

behavior toward their father"; and father had testified to experiencing increased distance between himself and L.W. Based on this evidence, the court found mother no longer supported "frequent and continuing contact" between the children and father. Thus, notwithstanding the children's acknowledged interest in "stability and continuity," the court concluded father should have primary physical custody to ensure there would be positive contact with "both parents."

## DISCUSSION

### 1. *The Family Court Reasonably Exercised Its Discretion to Preclude Mother from Calling J.W. as a Witness*

Section 3042 requires a court to "consider" and give "due weight" to the wishes of children who are of "sufficient age and capacity to reason so as to form an intelligent preference as to custody or visitation" when making or modifying a custody and visitation order. (*Id.*, subd. (a).) If a child is "14 years of age or older and wishes to address the court regarding custody or visitation, the child shall be permitted to do so, unless the court determines that doing so is not in the child's best interest, in which case, the court shall state its reasons for that finding on the record." (*Id.*, subd. (c).) Consistent with the foregoing, section 3042 directs the family court to control the child's examination, or even preclude the child from testifying altogether, "to protect the best interest of the child." (*Id.*, subd. (b).) If the court precludes the child's testimony, it must provide "alternate means" of obtaining information regarding the child's preferences. (*Id.*, subd. (e).) We review the family court's decision to preclude a child from testifying for an abuse

19

of discretion.  (See *Niko v. Foreman* (2006) 144 Cal.App.4th 344, 366.)

Rule 5.250(d)(3) provides a list of factors the judicial officer "should consider" in determining whether addressing the court is in a child's best interest, including whether the child is of sufficient age and capacity to form an intelligent preference as to custody or visitation and to understand the nature of testimony; whether the child "may be at risk emotionally" if he or she is permitted to address the court; whether the child's "anticipated" testimony is "relevant to the court's decisionmaking process"; and whether any other factors weigh in favor of or against having the child address the court, "taking into consideration the child's desire to do so."

Mother contends "every" rule 5.250(d)(3) factor "weighed in favor" of allowing J.W. to address the court, and she argues the family court abused its discretion by purportedly failing to state its reasons for finding J.W.'s best interests would not be served by permitting the testimony.  (See § 3042, subd. (c).)  She also claims the court failed to consider alternatives to obtaining information about J.W.'s preferences.  (See *id*., subd. (e).)  The record does not support mother's contentions.

The family court found calling J.W. as a witness "would not be in his best interest."  It expressly based that finding on a declaration and related testimony in which mother falsely "attributed language in her own declaration to [J.W.] and sought to place the child in the middle of a custody dispute in a manner the Court finds harmful to the child."  The court characterized this as "[t]he most troubling aspect of [mother's] testimony," summarizing it as follows:

"[Mother] also claims that [J.W.] desired to testify in this proceeding.  She told [J.W.] to write his statement to the judge in the third person.  [Mother] advised him what to include.  [J.W.], she claimed, then typed the statement himself.  According to [mother], she then cut and pasted this purported statement into *her* declaration, and . . . filed it."

"[J.W.], of course, did not sign the [declaration], and it is written in the third person, that is, [mother's] declaration says that [J.W.] says 'x' or wants 'y.'  These include allegations – again, claimed to come from [J.W.]'s mouth – that [father] is abusive toward both boys, the food in his house is bad (and such 'baby' portions!), the house 'lacks basic hygiene,' and there is insufficient hot water so they go to school without having showered."

"Although [mother's] declaration was filed only five weeks before the hearing started, she stated that [J.W.]'s purported original statement no longer existed, and it was not offered in evidence. [¶] Nothing about this is plausible.  No one who has been to [father's] home testified to inadequate hot water or unhygienic conditions; no one has noticed the children being dirty or underfed, despite teachers and a personal aide being with [L.W.] every day.  The children made no such complaints of malnourishment or ill treatment

to Ms. Manger. And [mother's] assertion
that she was merely presenting [J.W.]'s own
statement to the Court – now mysteriously
vanished from her computer – is absurd
on its face."

Our review of mother's testimony and declaration is consistent with the family court's summary.[11] Consistent with

_____

[11] Mother's declaration included other troubling statements that were strikingly similar to various threads of her narrative in the underlying custody proceedings. These statements— attributed to J.W. and, according to mother, supposedly "pasted" "verbatim" from the boy's written statement—included, among other things: "[J.W.] (14) has asked to address the court saying that he's afraid that he will be ordered to spend more time with Dad if he doesn't address the court"; "[J.W.] says that Dad told him and [L.W.] that 'Manger will make sure that I get more time with you guys; that's why I hired her' "; "[J.W.] gets upset when Dad makes [L.W.] cry, mocks him, provokes conflict, and physically hurts [L.W.]"; "[J.W.] says that Dad gives [J.W.] and [L.W.] guilt trips, so he fakes to agree with Dad just to avoid a guilt trip"; "[J.W.] says that 'Dad's pretty messed up', because he lies and blames Mom for his own faults under his own roof"; "[J.W.] says that Dad has tried to turn [J.W.] against [L.W.], saying all sorts of bad things about [L.W.] to [J.W.], and encouraging [J.W.] to not spend time with [L.W.]"; "[J.W.] wants the court to order Dad to stop being cruel to [J.W.] and [L.W.]"; "[J.W.] says that he saw [L.W.'s ABA therapist] abuse [L.W.] in therapy, as soon as Mom would turn her back"; "[J.W.] wants the court to order Dad to learn about being appropriate"; "[J.W.] and [L.W.] feel violated when Dad touches their bottoms inappropriately, ignoring their firm requests to stop, and they dislike Dad's vulgar sexual jokes and language with them"; "[J.W.] says that Mom respects him and [L.W.], asks their opinions on things, lets them make choices, and plays sports

the directive to consider information "indicating that the child may be at risk emotionally" if he is permitted to testify (rule 5.250(d)(3)(C)), the family court's statement of decision explains that mother's declaration and testimony proved mother "sought to place the child in the middle of a custody dispute *in a manner the Court finds harmful to the child*." (Italics added.) The record supports the court's ruling. We find no abuse of discretion.

The record also refutes mother's contention that the family court failed to obtain information about J.W.'s preferences through alternative means. (See § 3042, subd. (e).) As the court noted, it already "had the benefit of Ms. Manger's multiple interviews and observations" of J.W., which included information about his preference to maintain the existing custody and visitation arrangements. We are satisfied that the family court considered J.W.'s preference and gave it due weight in making the modification order. (*Id.*, subd. (a); see *In re Marriage of Winternitz* (2015) 235 Cal.App.4th 644, 655 (*Winternitz*) [where record indicated family court considered minor's preference,

---

and games with them"; "Dad forces everything, but gives them tons of screen time and adult content: it's unbalanced"; "[J.W.] recalls Dad forcing [L.W.] to play with his girlfriend's daughter, yelling at [L.W.] in front of the movie theater to please his girlfriends, etc."; "Dad didn't let [L.W.] attend his friend's birthday party, because of Dad's girlfriend['s] last minute plans"; "[L.W.] missed scout and catechism activities too when at Dad's"; "[J.W.] says that he can't rely on Dad; but he always can on Mom"; "[J.W.] says that Mom never speaks bad about Dad"; "[J.W.] says that he really loves his life at Mom's"; "[J.W.] says that Mom is firm about being responsible, but she's loving; never mean or inappropriate like Dad."

23

although it precluded minor's testimony, court did not abuse its discretion by declining to follow minor's wishes].)

**2.** ***The Family Court Properly Admitted the Custody Evaluator's Report into Evidence***

Mother contends the family court should have sustained her objections to the custody evaluator's report and excluded the report from evidence. She principally maintains the report and the evaluator's testimony related case-specific hearsay statements to the court as fact finder without a valid *Sanchez* waiver. (See fn. 4, *ante*.) She also argues the court and evaluator violated various statutory requirements that mandate exclusion of the report. The record does not support these contentions.

In *Sanchez*, our Supreme Court held that "[w]hen any expert relates to the jury case-specific out-of-court statements, and treats the content of those statements as true and accurate to support the expert's opinion, the statements are hearsay." (*Sanchez, supra,* 63 Cal.4th at p. 686.) Under *Sanchez*, an expert "may still rely on hearsay in forming an opinion, and may tell the jury *in general terms* that he did so," but an expert may not relate "case-specific facts asserted in hearsay statements, unless they are independently proven by competent evidence or are covered by a hearsay exception." (*Id.* at pp. 685–686.) "Case-specific facts" are those relating to the particular events and participants alleged to have been involved in the case being tried. (*Id.* at p. 676.)

Although we have not found relevant guidance in the body of law governing child custody decisions, we may assume without deciding that the principle articulated in *Sanchez* is applicable here, as child custody is a fundamental right implicating constitutional due process protections. (See *Stanley*

*v. Illinois* (1972) 405 U.S. 645, 651.)  Assuming the principle applies, the child custody evaluation plainly implicates *Sanchez* —the evaluator relied on out-of-court statements in formulating her opinions, and her report naturally related the contents of those out-of-court statements in explaining the basis for her recommendations.

The family court also assumed *Sanchez* applied, but it rejected mother's hearsay objection, concluding the parties had stipulated to admission of the custody evaluation report, subject to each party's right to cross-examine out-of-court declarants. (See § 3111, subd. (c) ["The [custody evaluation] report may be received in evidence on stipulation of all interested parties and is competent evidence as to all matters contained in the report."].) The plain language of the stipulation supports the court's ruling. The April 18, 2019 stipulation appointing Manger as custody evaluator, signed by mother and her counsel on November 16, 2018, states:  "To the extent that the evaluator testifies to case-specific facts based upon out-of-court statements and asserts those facts are true because she relied upon their truth in forming her opinion, the parties shall have the opportunity to cross-examine the out-of-court declarant or the evidence shall be excluded and the opinion upon which the evidence was relied shall be likewise excluded."  The stipulation also states: "The evaluator's report shall be received in evidence without foundation or objection, subject to cross-examination and the right of the parties to challenge the findings and conclusions of the evaluator and to examine her and any out-of-court declarants at the evidentiary proceeding."  The family court found the language was "unambiguous":  "If a party has the opportunity to cross-examine the 'out-of-court declarant,'

25

the declarant's statements may be received in evidence; without the opportunity to cross-examine, the evidence is excluded." Having independently reviewed the stipulation, we agree with the family court's construction of the relevant language. (See *Smith v. Selma Community Hospital* (2008) 164 Cal.App.4th 1478, 1501.)

Mother does not contend she was denied the opportunity to cross-examine out-of-court declarants. Instead, she asserts she "did not relinquish her right to *Sanchez* protections intentionally, knowingly, or voluntarily," because she merely "complied with her attorney's urgent 'ASAP' request to sign a document presented as a 'basic contract.' "[12] The family court rejected that factual contention, finding "[t]he parties intended to waive hearsay objections to the report under *Sanchez*, subject to a right to cross-examine the source of statements quoted in the report," and "both parties believed, and their conduct reflected the belief, that such *Sanchez* waivers had been agreed to." The evidence, including mother's signature on the stipulation (just below the clause stating the report "shall be received in evidence without foundation or objection"), supports the court's factual finding. The court's credibility finding against mother likewise supports its rejection of her claim that she did not knowingly execute the stipulation. (*Winternitz, supra,* 235 Cal.App.4th at p. 653 [credibility determinations are the exclusive province of the family court; as "an appellate court, we do not second-guess

---

[12] Mother refers to an email she received from her former attorney transmitting the stipulation appointing Manger as custody evaluator. She relied on the same email in her evidentiary objections to the custody evaluation report.

such evidentiary assessments"];  see *Long v. Long* (1967) 251 Cal.App.2d 732, 736–737 ["There is no denial of due process, however, when a litigant waives his right to object to the contents of a report."].)

Mother's other objections are similarly refuted by the record or fail to acknowledge the family court's discretion in ruling on factual and evidentiary matters related to a custody evaluation.  Mother contends the evaluator failed to send her a signed copy of the report at least 10 days before the hearing as required under rule 5.220(g)(1)(A).  But the evaluator testified she sent a signed report to mother shortly after the report was completed, when mother was self-represented, at the same time the evaluator sent the report to father's attorney and filed it with the court.  Mother's prehearing disclosure of her anticipated witnesses and evidence, made when she was self-represented and over a year before the evidentiary hearing commenced, acknowledged mother's receipt of the custody evaluation report and corroborated the evaluator's testimony on the issue.

Mother contends the evaluator failed to provide the required notice regarding confidentiality of the child custody evaluation report.  (See rule 5.220(g)(1)(B).)  However, the first page of the copy of the report included in mother's appellant's appendix is the form FL-328 *Notice Regarding Confidentiality of Child Custody Evaluation Report*, just as required under rule 5.220(g)(1)(B).

Mother contends the family court erred by failing to enter an order appointing the child custody evaluator on form FL-327. (See rule 5.225(k)(2); see also rule 5.220(d)(1)(B).)  Without the order, she argues the evaluator "arrogated to herself the authority to determine the evaluation's scope and purpose,"

in violation of rules requiring the evaluator to consider " 'the health, safety, welfare, and best interest of the child within the scope and purpose of the evaluation as defined by the court order.' " (See rule 5.220(d)(2)(A).) Contrary to that assertion, mother's stipulation appointing the evaluator, and the court's order entered upon it, specified that "THE PARTIES' ATTORNEYS SHALL PROVIDE INFORMATION TO THE EVALUATOR ABOUT THE SCOPE OF INQUIRY OF THE EVALUATION," and the evaluator's report provided recommendations the evaluator assessed to be in the children's best interests. (Boldface omitted.) Mother has not presented a record demonstrating the evaluator failed to follow this term of the stipulation, nor has she cited authority holding such a stipulation mandates exclusion of a custody evaluation report. (Cf. *In re Marriage of Seagondollar* (2006) 139 Cal.App.4th 1116, 1133 [order appointing evaluator was "woefully inadequate" where it "gave the evaluator carte blanche to define . . . purpose and scope of the evaluation"].)

Finally, the family court reasonably rejected mother's objections based on the evaluator's seeming failure to file the FL-326 declaration regarding qualifications and purported bias. (See rule 5.225(*l*)(1)(B).) It is settled that the family court has discretion to excuse an evaluator's failure to adhere to every requirement set forth in rule 5.220 or 5.225 and that the lower court's factual findings regarding claims of bias are subject to limited appellate review. (See *Winternitz, supra,* 235 Cal.App.4th at p. 653.) "To hold otherwise and thus to endorse appellate micromanagement of every communication or act by the evaluator would make it impossible for evaluators to perform

28

their very difficult and crucial functions." (*Leslie O. v. Superior Court* (2014) 231 Cal.App.4th 1191, 1212.)

The evaluator testified to her qualifications, and the family court reasonably determined mother's objection regarding the FL-326 form went to "the weight to be accorded the [evaluator's] opinion," but did not warrant striking the report.[13] (See *Winternitz, supra,* 235 Cal.App.4th at p. 653.) The evaluator also testified that she controlled for bias and gathered balanced information from both parties. The court found there was no basis for mother's claim of bias, which amounted to "a statement of disagreement, not [an] evidentiary objection[ ]." Mother has not presented a record demonstrating the court abused its discretion. (See *id.* at pp. 653–654.)

3. ***Substantial Evidence Supports the Family Court's Changed Circumstances Finding***

Mother contends the family court erred by modifying a permanent custody arrangement without applying the changed circumstances rule or weighing policy considerations favoring stable custody arrangements. The record contradicts her on both counts.

---

[13] The evaluator testified she is a licensed clinical social worker. (See rule 5.225(c)(1)(D).) She has performed over 750 full child custody evaluations, over 350 solution focused evaluations, and 10 to 12 evaluations involving special needs children, and she has completed the education and training requirements for custody evaluators specified in the California Rules of Court. (See rule 5.225(d).) Manger also testified that she has experience working with special needs children in her private practice and in a special education school, and she has specialized training for autism and ABA therapies.

29

The family court is authorized to modify child custody and visitation orders throughout a child's minority whenever the court finds a modification is "necessary or proper" in the child's best interests. (§§ 3022, 3087; see also § 3088 [modification to or from joint custody].) "An application for a modification of an award of custody is addressed to the sound legal discretion of the [family] court, and its discretion will not be disturbed on appeal unless the record presents a clear case of an abuse of that discretion." (*Foster v. Foster* (1937) 8 Cal.2d 719, 730; *Munson v. Munson* (1946) 27 Cal.2d 659, 666.) We must draw all presumptions in favor of the challenged order's reasonableness and, in the absence of a record compelling the conclusion that modification was not warranted, we cannot interfere with the family court's decision to modify a custody award. (See *Prouty v. Prouty* (1940) 16 Cal.2d 190, 193 (*Prouty*).)

Once a family court has entered a final or permanent custody order reflecting that a particular custodial arrangement is in the best interest of a child, " 'the paramount need for continuity and stability in custody arrangements—and the harm that may result from disruption of established patterns of care and emotional bonds with the primary caretaker—weigh heavily in favor of maintaining' that custody arrangement." (*In re Marriage of Brown & Yana* (2006) 37 Cal.4th 947, 956; *In re Marriage of Burgess* (1996) 13 Cal.4th 25, 32–33 (*Burgess*).) In recognition of this policy concern, our Supreme Court has articulated a "variation on the best interest standard, known as the changed circumstance rule, that the trial court must apply when a parent seeks modification of a final judicial custody determination." (*Brown & Yana,* at p. 956; *Burchard v. Garay* (1986) 42 Cal.3d 531, 534 (*Burchard*) ["The changed-

circumstance rule is not a different test, . . . but an adjunct to the best-interest test."].)  "Under the changed circumstance rule, custody modification is appropriate only if the parent seeking modification demonstrates 'a significant change of circumstances' indicating that a different custody arrangement would be in the child's best interest.  [Citation.]  Not only does this serve to protect the weighty interest in stable custody arrangements, but it also fosters judicial economy." (*Brown & Yana,* at p. 956; *Burchard*, at p. 534.)

"The [changed-circumstance] rule requires that one identify a prior custody decision based upon circumstances then existing which rendered that decision in the best interest of the child.  The court can then inquire whether alleged new circumstances represent a significant change from preexisting circumstances, requiring a reevaluation of the child's custody." (*Burchard, supra,* 42 Cal.3d at p. 534.)  "[I]n view of the child's interest in stable custodial and emotional ties, custody lawfully acquired and maintained for a significant period will have the effect of compelling the noncustodial parent to assume the burden of persuading the trier of fact that a change [in custody] is in the child's best interest." (*Id.* at p. 536.)

Notwithstanding the child's interest in stability, "in exercising its discretion, the trial court must duly evaluate *all* the important policy considerations at issue in any change of custody and make its ultimate ruling based upon a determination of the best interests of the child." (*In re Marriage of McLoren* (1988) 202 Cal.App.3d 108, 113 (*McLoren*), italics added; see § 3020; see also *Burchard, supra,* 42 Cal.3d at p. 535.)  "[I]t is the public policy of this state to ensure that the health, safety, and welfare of children shall be the court's primary concern

31

in determining the best interests of children." (§ 3020, subd. (a).) Furthermore, so long as consistent with that primary concern, our state's public policy also directs the family court "to ensure that children have frequent and continuing contact with both parents after the parents have separated or dissolved their marriage." (*id.,* subd. (b).)

In its statement of decision, the family court identified two primary changed circumstances that warranted modification of the physical and legal custody arrangements, respectively: (1) mother had exploited the existing sole physical custody arrangement to "sabotage the boys' relationship with their father"; and (2) the parents' "abysmal co-parenting relationship" had rendered the existing joint legal custody arrangement untenable.

Mother contends these findings fail to "identify" circumstances that existed in 2016 that have since changed to require a custody modification. In her telling, father's evidence proved only that "[m]other has always been oppositional toward [f]ather, hostile toward professionals, bent on alienating the [c]hildren from [f]ather, and prone to false assertions." Because father proved only that she had "always" engaged in this destructive behavior, mother contends the family court erred by ordering a custody modification without requiring father to meet his " 'initial burden' " to show " 'changed circumstances affecting the children.' " We agree with father—the argument is "absurd."

To accept mother's argument, we would be forced to assume, contrary to the public policy of this state, that her alienating conduct was among the "circumstances then existing which rendered [the 2016 custody judgment] in the best interest

32

of the child[ren]." (*Burchard, supra,* 42 Cal.3d at p. 534; cf. § 3020, subd. (b).) Not surprisingly, the 2016 judgment manifestly disproves that absurd notion. Indeed, the judgment expressly states the decision to grant mother primary physical custody, with generous visitation rights for father, was based upon "the policy of the State of California to assure that the children have frequent and continuing contact with *both parents*" as well as "the children's interest in stability and continuity in the existing custodial arrangement" with mother. (Italics added.) Even absent this express statement, the family court could have reasonably presumed the judgment awarding mother de facto sole physical custody was predicated on a judicial determination that mother would facilitate the generous visitation rights granted to father in the decree. (See *Prouty, supra,* 16 Cal.2d at p. 193.) Based on the evidence presented, the family court found mother, contrary to an express predicate for the 2016 judgment, exploited the award of sole physical custody to sabotage the boys' relationship with father and frustrate his visitation rights. That finding supported the order modifying physical custody.[14]

---

[14] Mother's objection to the family court's discussion of scholarship on the subject of parental alienation fails to acknowledge that a court may properly consider evidence that one parent is not supportive of the other parent's relationship with the child when considering custody and related issues. (See *In re Marriage of LaMusga* (2004) 32 Cal.4th 1072, 1085 (*LaMusga*) ["[T]he mother is not purposely trying to alienate the children from their father, but . . . the mother's inability to 'let go' of her anger toward the father caused her to project those feelings onto their children and to reinforce the children when they expressed negative feelings toward their father."].) Having examined the entire cause, we are satisfied that, notwithstanding

(See *Moffat v. Moffat* (1980) 27 Cal.3d 645, 652 (*Moffat*) ["The deliberate sabotage of visitation rights not only furnishes ground for modification, it is a significant factor bearing on the fitness of the custodial parent."]; *Catherine D. v. Dennis B.* (1990) 220 Cal.App.3d 922, 932 (*Catherine D.*) [mother's "unrelenting pattern of frustrating" father's visitation rights, coupled with findings that father was more likely to permit child's frequent and continuing contact with noncustodial parent, "alone provided adequate grounds for changing custody" to father]; *In re Marriage of Wood* (1983) 141 Cal.App.3d 671, 682 (*Wood*) ["Frustration of visitation rights by the custodial parent is a proper ground for transfer of custody to the formerly noncustodial parent."].)

To accept mother's argument regarding legal custody, we would similarly be forced to assume her oppositional posture toward father and open hostility to the recommendations of medical and mental health professionals was among the existing circumstances in 2016 that supported a judicial determination that granting mother and father joint legal custody would be in the children's best interests. (See *Burchard, supra,* 42 Cal.3d at p. 534.) No reasonable assessment of the 2016 judgment that we or the family court could make permits such an assumption. (See, e.g., *McLoren, supra*, 202 Cal.App.3d at p. 116 [where "record contains no evidence the parties currently are ready, willing, or able to engage in such a cooperative effort," family court errs in finding joint legal custody is in child's best interest].)

the court's citation to law review articles concerning parental alienation, the family court based its modification of the physical custody arrangement on the evidence presented at the hearing and no miscarriage of justice occurred. (See *F.P. v. Monier* (2017) 3 Cal.5th 1099, 1108.)

On the contrary, the joint legal custody arrangement set forth in the judgment was unambiguously predicated on the parents' then-existing ability to "confer" and "consent . . . in making decisions" regarding the boys' school enrollment; participation in extracurricular activities; nonemergency medical, dental, and orthodontic treatment; participation in mental health therapy; and out-of-state travel.[15]  Indeed, the judgment expressly provided "[t]he failure to obtain mutual consent on these matters may result in, among other things, the court's *modifying the order of joint legal custody*." (Italics added.)  As Manger's report catalogued, mother's and father's ability to co-parent the boys collapsed in the years following entry of the judgment.  The evidence supports the family court's finding that this collapse was primarily due to mother's "need for control, certitude in her correctness, casual attitude toward facts, and [her] conviction that anyone who disagrees with her must have an ulterior motive."

Mother contends the family court failed to "give due weight" to the boys' need for continuity and stability in custody arrangements and the harm that may result from disrupting established patterns of care and emotional bonds with the primary caretaker. (*Burgess, supra,* 13 Cal.4th at pp. 32–33.)  The argument is one of too many instances in which mother

---

[15]    Contrary to mother's assertions in her appellate briefs and hearing testimony, the 2016 judgment expressly provided, "The parties shall not remove the minor children from the State of California without the prior written consent of the other party or an order of the court."

has ignored the record when it is unfavorable to her.[16]  In its statement of decision, the family court expressly acknowledged the children's interest in "stability and continuity in custody arrangements," but found "this significant interest is not a reason to permit one parent to harm the children's relationship with the other parent."  As we have already discussed, it is settled that a custodial parent's deliberate efforts to frustrate frequent and continuing contact with the other parent is a "proper ground for transfer of custody to the formerly noncustodial parent," notwithstanding a child's interest in stability and continuity. (*Wood, supra,* 141 Cal.App.3d at p. 682; see *Moffat, supra,* 27 Cal.3d at p. 652; *Catherine D., supra,* 220 Cal.App.3d at p. 932; see also *LaMusga, supra,* 32 Cal.4th at p. 1085.)  Moreover, the family court expressly considered "other aspects of continuity," observing that in father's physical custody the boys would "continue to live in the same neighborhood, attend the same school, be able to continue in extracurricular activities, and be treated by the same health professionals," while still having

---

[16]    Notwithstanding well-established principles governing review, mother's opening brief presents a factual and evidentiary account that substantially disregards the evidence favorable to the family court's order and the reasonable inferences that must be drawn from that evidence.  (See *In re Marriage of Fink* (1979) 25 Cal.3d 877, 887; *Prouty, supra,* 16 Cal.2d at p. 193; *Pappas v. Chang* (2022) 75 Cal.App.5th 975, 985.)  This infraction has special consequences for mother's contentions that the evidence was insufficient to support the family court's findings regarding mother creating deadlocks that impeded L.W.'s therapy, her obstruction of the children's interest in frequent and continuing contact with father, and her failure to cooperate with father regarding out-of-state travel and the children's religious upbringing—all of which we "summarily reject."  (*Fink*, at p. 887.)

"frequent and continuing contact" with mother. Contrary to mother's bald assertion, the family court's statement of decision was far from " 'silent' " on the effects the change of custody would have on the children. (Cf. *In re Marriage of Williams* (2001) 88 Cal.App.4th 808, 813 [record was "silent on the adverse effect" custody order would "necessarily have from the point of view of the children" where family court ordered two siblings to move to Santa Barbara with father and other two siblings to move to Utah with mother, while "record contain[ed] no psychological evaluations, no school or medical records and no input from the children," and court had received "no evidence concerning the extent to which the siblings are bonded to one another"].) The family court reasonably exercised its discretion to modify custody under the changed circumstance rule.

## DISPOSITION

The order is affirmed.  James Whooley is entitled to his costs.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EGERTON, J.

We concur:



LAVIN, Acting P. J.



NGUYEN (KIM), J.[*]

---

[*]      Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.